## CITY OF CINCINNATI *v.* LOUISVILLE & NASH-VILLE RAILROAD CO.

### ERROR TO THE SUPREME COURT OF THE STATE OF OHIO.

No. 385. Submitted January 9, 1912.—Decided February 19, 1912.

After its admission into the Union, the legislative power of the State of Ohio was not restricted in any way by the provisions of Article 2 of the Northwest Ordinance of 1787, except as limited by its own constitution, and that State has every power of eminent domain which pertains to the other States.

Article 2 of the Northwest Ordinance did not forbid the appropriation by eminent domain of a contract dedicating land to the common use and benefit of a town.

The act of the Ohio legislature of 1908, § 3283, and the ordinance of

the city of Cincinnati thereunder, condemning a right of way across the public landing at Cincinnati, are not unconstitutional as impairing the obligation of the contract dedicating the landing as a common for the use and benefit of the town forever.

A dedication of land as a common for use and benefits of the town forever as shown on a plan, and the acceptance by the town and the sale of lots under the plan constitutes a contract the obligation whereof .is protected by the contract clause of the Federal Constitution.

The right of every State to exercise the power of eminent domain as to every description of property is an inherent power without which it cannot perform its functions.

The power of eminent domain was not surrendered by the States to the United States or affected by the Federal Constitution except that it must be exercised with due process of law and on compensation being made.

The power of eminent domain extends to tangibles and intangibles, including choses in action, contracts and charters. ·

An appropriation under eminent domain with compensation of a contract neither challenges its validity nor impairs the obligation. It is a taking, not an impairment, of its obligation.

Every contract, whether between the State and an individual or between individuals only, is subject to the law of eminent domain, for there enters into every engagement the unwritten condition that it is subject to appropriation for public use.

The ordinance of the Northwest Territory ceased to be, in itself, obligatory upon the States carved from that Territory after their admission into the Union as States, except so far as adopted by the States themselves and made a part of the laws thereof.

On its admission, whatever the conditions may have been prior thereto, whether from the conditions of the Northwest Ordinance or other territorial government, a State at once becomes entitled to and possessed of all the rights of dominion and sovereignty which belonged to the original States, and all limitations on sovereignty in the act of admission not subsequently adopted by the State itself are inoperative. *Coyle* v. *Oklahoma*, 221 U. S. 559.

When the United States as an independent sovereign creates a territorial government with legislative authority, subject only to limitations of the creating act, it will be presumed to grant to the new dependent government the vital powers incident to and necessary to sovereignty unless it plainly appears to be withheld.

The right to appropriate property being a necessary incident to sov-

ereignty, Art. 2 of the Northwest Ordinance giving power only to take property in a public exigency for compensation, will be broadly construed as simply limiting the general right of eminent domain by the requirement that compensation be made.

A public exigency exists for the common preservation when the legislature declares that for a *bona fide* public purpose there should be a right of way for a common carrier across a particular piece of property, and in such a case the propriety of the appropriation cannot be questioned by any other authority. *United States* v. *Jones*, 109 U. S. 519.

*Quære:* Whether the only power of eminent domain to which a contract is subordinate is the power as it existed at the time that the contract was made or at the time of appropriation.

82 Oh. St. 466, affirmed.

THE facts, which involve the constitutionality of a municipal ordinance of Cincinnati and statute under which it was passed permitting condemnation for a right of way, are stated in the opinion.

*Mr. Edward M. Ballard* and *Mr. Albert Bettinger* for plaintiff in error:

The dedication of the public landing in January, 1789, was a contract between the dedicators and the subsequently created city of Cincinnati, by which the latter became perpetually obligated to hold the same in trust for the public; and inasmuch as the power of eminent domain then residing in the Northwest Territory was, by the ordinance of 1787, limited to cases for the common preservation, no greater power was read into the contract, and therefore the application of §3283a to this public landing impairs the obligation of that contract. *Fletcher* v. *Peck*, 6 Cr. 87, 136.

The law of eminent domain only as it existed at the time of the dedication like all other laws then existing was read into the contract of dedication.

Where the plenary power of eminent domain exists at the time contracts are entered into, the subsequent

exercise of the right by the sovereign does not impair their obligations.

In the case at bar, however, when the contract dedicating the public landing was made in January, 1789, no power of eminent domain resided in the Northwest Territory, which was not a sovereign but only a dependency of the Confederate States. The only power of eminent domain then existent was that which was conferred upon the Territory by the ordinance of 1787, and which was limited to the taking of private property only for the common preservation in cases of public exigencies. *Von Hoffman* v. *Quincy,* 4 Wall. 535, 555; *McCracken* v. *Hayward,* 2 How. 608, 612.

As to what laws do and do not impair the obligation of contracts, see *Smith* v. *Parsons,* 1 Ohio, 236, 240; *Goodale* v. *Fennell,* 27 Oh. St. 426; *Sturges* v. *Crowningshield,* 4 Wheat. 122; *Green* v. *Biddle,* 8 Wheat. 1.

It is clear that only such laws as are in force at the time the contract is made become terms of it, and that subsequent laws do not apply to previously made contracts if their effect would be to impair the obligation of the same.

Constitutional provisions, equally with legislative enactments, come within the inhibition against the impairment of contractual obligations; *Railroad Co.* v. *McClure,* 10 Wall. 511, 515; *Shreveport* v. *Cole,* 129 U. S. 36, 42; *Gunn* v. *Barry,* 15 Wall. 610, 623; *Fisk* v. *Jefferson Police Jury,* 116 U. S. 131, 135; *Clay County* v. *Society for Savings,* 104 U. S. 579; *Dodge* v. *Woolsey,* 18 How. 331; *Matheny* v. *Golden,* 5 Oh. St. 369.

A contract which fixes the perpetual use to which the land shall be put, cannot by subsequent enlargement of the power of eminent domain be taken for a different use.

The inhibition against the impairment of contractual obligations is found in all the fundamental laws of the country from the beginning, and is absolute. *Toledo Bank* v. *Bond,* 1 Oh. St. 623, 687.

The contract in this case does not fall within the class of contracts that are made under a government then possessing the power of eminent domain, which is asserted against the contract, but was made under a government, whose power of eminent domain was limited to the "common preservation" in cases of public exigencies.

The phrase "equal footing with the original States in all respects whatever," does not mean that each new State had to come into the Union with its inherent power of eminent domain unabridged and unlimited, or with its power of eminent domain the same as the original States. It means that with respect to the National Government they must be on an equal footing with the original States. The new States must have the same obligations toward the National Government, and are entitled to the same privileges as the original States. In all other respects each State is supreme within her own territorial limits, free to frame her own constitution, enact her own laws, abridge her sovereignty, and therefore to limit her inherent right of eminent domain. *Matheny* v. *Golden*, 5 Oh. St. 369, 370; *Case* v. *Toftus*, 39 Fed. Rep. 730; *State* v. *Boone*, 84 Oh. St. 346, 359; *Spooner* v. *McConnell*, 1 McLean, 337, 348; *Land* v. *Manistee River Imp. Co.*, 123 U. S. 288, 295; *Coyle* v. *Smith*, 221 U. S. 559, 567, 579, recognize the right of a State to be supreme in its own territory after its admission into the Union.

As to the right of the State to alter or abridge the power of eminent domain by a change in the Constitution, see *Toledo Bank* v. *Bond*, 1 Oh. St. 622, 688.

It cannot be said that because of the dedicators' knowledge that a new State was to be formed, the contract of dedication was made subject to whatever power of eminent domain the new State should by its constitution retain.

The power of eminent domain is not any greater than the right of a State to alter or destroy her municipal corporations, either by constitutional change or legislative

act. Each is an attribute of sovereignty, but such altera-
tion or destruction is within the constitutional inhibition
against impairing the obligation of contracts. *Graham* v.
*Folsom*, 200 U. S. 248, 253.

Only the power of eminent domain as it existed in the
Northwest Territory· at the time of the dedication in
January, 1789, was read into the contract of dedication,
and the exercise of any different power of eminent domain
impairs the obligations of that contract, and is forbidden
by the United States Constitution.

The only power of eminent domain in the Northwest
Territory under the ordinance of 1787 was where "the
public exigencies made it necessary for the common pres-
ervation."

Where a political community is a dependency as dis-
tinguished from a sovereignty, having no inherent power
of eminent domain, it may acquire the power by delega-
tion from the sovereignty of which it is a dependency.

Thus the power of eminent domain inheres in the
Federal Government and the States by virtue of their
sovereignty, while it does not inhere in the Territories
of the Federal Government, which, instead of possessing
sovereignty, are mere· subordinate political divisions or
dependencies of the Federal Government, and therefore
have only such power of eminent domain as is delegated
to them.

As the Northwest Territory was a .dependency of the
Confederacy, without sovereignty, it possessed no in-
herent power of eminent domain but only such power
as was in some way conferred upon it. *Luxton* v. *North
River Bridge Co.*, 153 U. S. 525; *Chappel* v. *United States*,
160 U. S. 499; *Van Brocklin* v. *Tennessee*, 117 U. S. 151;
*United States* v. *Gettysburg Electric Ry.*, 160 U. S. 668.

The power of eminent domain was not conferred by the
provision that no man shall be deprived of his liberty or
property, but by the judgment of his peers or the law of·

the land. *Den* v. *Hoboken Land & Imp. Co.*, 18 How. 272, 276.

The phrase "due process of law" has been variously defined, but it is now well settled that it has reference to ordinary judicial proceedings in court. *Hagar* v. *Reclamation District*, 111 U. S. 701, 708; *Turpin* v. *Lemon*, 187 U. S. 51, 58; *Hurtado* v. *California*, 110 U. S. 516, 537; and see definition given by Mr. Webster in his argument in the *Dartmouth College Case*, 4 Wheat. 518, 581.

Another reason for the claim that the power of eminent domain was limited to a taking for the common preservation is that the framers of the ordinance by express provision safeguarded the rights of the people by insuring compensation when their property is taken for the "common preservation," while no such restriction is made with reference to taking private property for other public uses.

The reason is clear. The United States after the adoption of the Federal Constitution had the inherent power of eminent domain, and to guard against the arbitrary exercise of the power, compensation was secured to the owner, and the taking had to be "by due process of law." The Northwest Territory, on the other hand, had no power of eminent domain except for the "common preservation" and there was, therefore, no need for a provision for compensation except when taken for the common preservation. See the only case on the subject, *Newcomb* v. *Smith*, 1 Chandler (Wis.), 71.

The power of eminent domain was not conferred on the Northwest Territory by the provision in the ordinance that "the governor, legislative council and house of representatives shall have authority to make laws in all cases for the good government of the district," etc.

*Mr. J. B. Foraker* and *Mr. Ellis G. Kinkead* for defendant in error:

Under the ordinance of 1787, there was conferred upon

the territorial legislature the power of eminent domain. *Giesy* v. *Railroad Co.,* 4 Oh. St. 308.

Whatever limitations the ordinance contained upon the exercise by the territorial legislature of the power of eminent domain, they became of no effect upon the organization and admission of the State of Ohio into the Union.

The State of Ohio has had since 1802 the full power of eminent domain, excepting such part as is reserved to the Federal Government; there is no land within the State of Ohio not subject to the State's power of eminent domain. That power is a right of sovereignty superior to any private right of property, however or whenever acquired. Against the sovereignty no private rights avail. Contracts are not protected from it by the Federal Constitution or the state constitution, for the very contract may itself be appropriated by the State in the exercise of this power. Art. I, § 10 of the Federal Constitution, forbidding a State to pass any law impairing the obligation of contracts, was not to limit the exercise by the State of the power of eminent domain. When the effect of such exercise is to appropriate a contract right for which compensation is given, the contract is not thereby impaired or abrogated, but its validity is recognized, and all rights thereunder merely pass by forcible purchase to the State. *Long Island Water Supply Co.* v. *Brooklyn,* 166 U. S. 685; *Offield* v. *Railroad Company,* 203 U. S. 372, 382; *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 582.

All land within Ohio has at all times since its occupation by civilized governmental authority been subject to the right of eminent domain.

This court has repeatedly held that the ordinance of 1787 ceased to be operative in the territory of States subsequently formed out of the Northwest Territory. *Escanaba Co.* v. *Chicago,* 107 U. S. 678; *Huse* v. *Glover,* 119 U. S. 543; *Sand* v. *Manistee River Imp. Co.,* 123 U. S. 288, 295; *Hamilton* v. *Vicksburg &c. R. R. Co.,* 119

U. S. 280, 284; *Cardwell* v. *Bridge Company*, 113 U. S. 205, 210, 212; *Ward* v. *Racehorse*, 163 U. S. 504.

In *Coyle* v. *Oklahoma*, 221 U. S. 559, these cases and others to the same effect were fully reviewed and approved. The decision in all these cases rests upon the fact that all States admitted into the Union subsequent to the adoption of the Federal Constitution must come in on an equal footing with the original States in all respects.

MR. JUSTICE LURTON delivered the opinion of the court.

Under an act of the legislature of the State of Ohio of May 9, 1908 (Laws 1908, p. 308), being § 3283–a, and an ordinance of the city of Cincinnati in pursuance of that act, the defendant railroad company instituted, in a court of the State of Ohio, a suit to condemn a right of way for an elevated railroad track across the public landing at Cincinnati. Pending the condemnation proceeding the city of Cincinnati filed a bill in one of the Common Pleas Courts to enjoin the railroad company from constructing its railway across said public landing in pursuance of its agreement and contract with the city under the ordinance mentioned, and to restrain the prosecution of its pending petition for the condemnation of an easement of way across the landing. The ground upon which it was sought to stop the condemnation proceeding and prevent the company from constructing its elevated tracks across the public landing was that § 3283–a, Revised Statutes of Ohio, under which alone an easement of way might be appropriated, was repugnant to Art. I, § 10 of the Constitution of the United States, forbidding any State to pass any law impairing the obligation of a contract, in so far as § 3283–a, applied to the particular property across which an easement of way was sought to be appropriated.

That section, so far as necessary to be here stated, provides that upon compliance therewith any railroad

company owning or operating a railroad wholly or partially within the State might "use and occupy for an elevated track any portion of any public ground lying within the limits of any municipality and dedicated to the public for use as a public ground, common, landing or wharf, or for any other public purpose," excepting streets, alleys and public roads. It is provided that before instituting a proceeding for the appropriation of the needed easement, which is to be according to a general statute referred to, such company shall submit plans for the structure, and come to an agreement with the city council of the municipality concerned, as to the terms and conditions upon which the easement shall be occupied.

The proprietors of the grant of land upon which the city of Cincinnati was originally laid out, made a plan or plat of the proposed town, according to which plan a strip of ground between Front street and the Ohio river was set apart "as a common for the use and benefit of the town forever." The effect of the sale of the town lots under this plan has long since been held to constitute a dedication of the river front strip to the public use and to have vested in the city of Cincinnati a valid title in trust for the public use in the same manner that streets were held under the same plat or plan. *City of Cincinnati* v. *White*, 6 Pet. 431. This dedication was made in 1789, and the property has ever since been used as a public landing or wharf.

A demurrer to the petition was sustained by the Court of Common Pleas, and the bill dismissed. This was affirmed upon appeal to the Circuit Court, and again affirmed upon appeal to the Supreme Court of the State.

That the dedication in 1789, and acceptance by the then town of Cincinnati constitutes a contract with the dedicators obligatory upon the town and its successor, the city of Cincinnati, may be conceded. The contention is that the Ohio act of May 9, 1908, now § 3283-a.

Revised Statutes of Ohio, is an impairment of the contract, forbidden by the tenth section of the first Article of the Constitution of the United States. But the right of every State to authorize the appropriation of every description of property for a public use is one of those inherent powers which belong to state governments, without which they could not well perform their great functions. It is a power not surrendered to the United States and is untouched by any of the provisions of the Federal Constitution, provided there be due process of law, that is, a law authorizing it, and provision made for compensation. This power extends to tangibles and intangibles alike. A chose in action, a charter, or any kind of contract, are, along with land and movables, within the sweep of this sovereign authority.

The constitutional inhibition upon any state law impairing the obligation of contracts is not a limitation upon the power of eminent domain. The obligation of a contract is not impaired when it is appropriated to a public use and compensation made therefor. Such an exertion of power neither challenges its validity nor impairs its obligation. Both are recognized, for it is appropriated as an existing enforceable contract. It is a taking, not an impairment of its obligation. If compensation be made, no constitutional right is violated. All of this has been so long settled as to need only the citation of some of the many cases. *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420; *The West River Bridge Co.* v. *Dix,* 6 How. 507; *N. O. Gas Co.* v. *La. Light Co.,* 115 U. S. 650; *Long Island Water Supply Co.* v. *Brooklyn,* 166 U. S. 685; *Offield* v. *Railroad Co.,* 203 U. S. 372.

Every contract, whether between the State and an individual or between individuals only, is subject to this general law. There enters into every engagement the unwritten condition that it is subordinate to the right of appropriation to a public use. *The West River Bridge Co.*

*v. Dix*, 6 How. 507; *Long Island Water Supply Co.* v. *Brooklyn*, 166 U. S. 691–2.

These general propositions are not challenged.

But it is said, that the right of appropriating private property to a public use possessed by the State of Ohio is only that which is defined and limited by the second article of the ordinance of 1787 (July 13, 1787, 1 Stat. 52); creating a government for the Northwest Territory, which embraced the territory which later became the State of Ohio. That ordinance, after providing for a territorial government, declares certain political principles to be fundamental and that they should constitute the "basis of all laws, constitutions and governments," thereafter organized out of that territory and should be regarded as "articles of compact between the original States and the people and States in the said territory, and be unalterable unless by common consent." The article referred to and claimed now to be still obligatory, is in these words:

"No man shall be deprived of his liberty or property, but by the judgment of his peers, or the law of the land, and should the public exigencies make it necessary, for the common preservation, to take any person's property, or to demand his particular services, full compensation shall be made for the same."

But the ordinance of 1787 as an instrument limiting the powers of government of the Northwest Territory, and declaratory of certain fundamental principles which must find place in the organic law of States to be carved out of that Territory, ceased to be, in itself, obligatory upon such States from and after their admission into the Union as States, except in so far as adopted by such States and made a part of the law thereof. This has been the view of this court so often announced as to need no further argument: *Pollard's Lessee* v. *Hagan*, 3 How. 212; *Permoli* v. *First Municipality*, 3 How. 589; *Escanaba Co.* v. *Chicago*, 107 U. S. 678, 688.

In *Escanaba Co.* v. *Chicago, supra,* it was said:

"Whatever the limitation upon her powers as a government whilst in a territorial condition, whether from the ordinance of 1787 or the legislation of Congress, it ceased to have any operative force, except as voluntarily adopted by her, after she became a State of the Union. On her admission she at once became entitled to and possessed of all the rights of dominion and sovereignty which belonged to the original States. She was admitted, and could be admitted, only on the same footing with them. The language of the resolution admitting her is 'on an equal footing with the original States *in all respects whatever.*' 3 Stat. 536. Equality of constitutional right and power is the condition of all the States of the Union, old and new. Illinois, therefore, as was well observed by counsel, could afterwards exercise the same power over rivers within her limits that Delaware exercised over Black Bird Creek, and Pennsylvania over the Schuylkill River."

In *Coyle* v. *Oklahoma,* 221 U. S. 559, the case of *Escanaba Co.* v. *Chicago,* and the cases cited therein, were fully reviewed and held applicable to conditions imposed by Congress in the enabling act under which Oklahoma was admitted, and all limitations in that act were held inoperative after admission, in so far as they had not been subsequently adopted by the State and were in derogation of the equality in power of that State with the other States of the Union.

It is next contended that whether the provisions of Art. 2 now constitute the irrevocable fundamental law of Ohio or not, that that provision was the only law of eminent domain existing in 1789, and as such is to be regarded as read into the contract of dedication, and, therefore, is the only power of eminent domain to which that contract was subordinate. Upon this hypothesis is based the contention that any subsequent law of Ohio authorizing a taking of this property for a purpose or use not within

the terms of the ordinance of 1787 is a law impairing the obligation of a contract.

But the assumption that the power of eminent domain possessed by the Northwest Territory in 1787 was limited as claimed is untenable. The clause referred to assumes the existence of a general power of eminent domain in the Government, and provides that when exerted there must be full compensation for the property taken or the services required. That this is so is apparent not only from the language of the clause, but from a general consideration of the purpose and object of the Congressional act in which the article appears. The ordinance of 1787 was a law providing for the government of the territory of the United States northwest of the River Ohio. It provided for the appointment of a governor and secretary and for the appointment of judges and the organization of courts with common-law jurisdiction. To the governor and judges was granted legislative power to adopt and publish such laws of the original States as should seem to be adapted to the conditions, which were to be and remain in force unless disapproved by Congress. Authority to elect a legislature was conferred when there should be five thousand inhabitants.

Upon this Article 2, heretofore set out, is claimed to be a contractual limitation, based upon the contract of dedication, by which this particular strip of river front is forever protected against an exercise of the power of eminent domain by the State of Ohio, except where "the public exigency makes it necessary for the common preservation." If we assume, for argument, that an affirmative limitation upon the right of appropriating property to any public purpose would so enter into any contract as to forever afterwards bind the hands of the State, no such situation is here presented. Article 2 is not a grant of power, but a limitation upon the power of eminent domain assumed to exist. It was conferred upon the governor and judges

by the power to adopt and publish the laws of any original
State deemed appropriate, and by the second section there
was conferred upon the governor and legislature, when
organized, "authority to make laws in all cases  .  .  .
not repugnant to the principles and articles in this ordi-
nance established and declared." This legislative power,
temporarily in the governor and a majority of the judges,
and then in the governor and the legislature, when organ-
ized, included, by necessary implication, the general power
to provide for the appropriation of private property for
public purposes. If this is not the case, then the ordinance
granted no power of that kind whatever, for the clause
above cited is obviously a mere restriction by which com-
pensation is required.

This right of appropriating private property to a pub-
lic use is one of the powers vital to the public welfare of
every self-governing community. It is a power which this
court has described as an "incident to sovereignty," a
power which "belongs to every independent government."
In *United States* v. *Jones,* 109 U. S. 513, 518, it was said:

"The provision found in the Fifth Amendment to the
federal Constitution, and in the Constitutions of the
several States, for just compensation for the property
taken, is merely a limitation upon the use of the power.
It is no part of the power itself, but a condition upon which
the power may be exercised. It is undoubtedly true that
the power of appropriating private property to public
uses vested in the general government—its right of emi-
nent domain, which Vattel defines to be the right of dis-
posing, in case of necessity and for the public safety, of
all the wealth of the country—cannot be transferred to a
State any more than its other sovereign attributes; and
that, when the use to which the property taken is applied
is public, the propriety or expediency of the appropriation
cannot be called in question by any other authority."

That the Northwest Territory was not a State, but a

mere territorial dependency is of no consequence. The United States was an independent sovereign, and when it created a territorial government with legislative authority subject only to the limitations of the creating act, it granted to this new dependent government this vital power unless it plainly appears that it was withheld.

The denial of such a power to this new government intended as the forerunner of a group of States west of the Ohio, or its restriction to purposes of necessary defense only, as appellant would construe the language of the article above set out, is not to be easily or lightly presumed. The power was one necessary to the work which this pioneer community was set on doing. It was a power well nigh as essential to the existence of the government as the taxing power. The language of Chief Justice Taney in the *Charles River Bridge Case*, 11 Pet. 420, 547, when speaking of a contention that the State of Massachusetts had surrendered the power, by granting a charter for the construction of a particular bridge, to appropriate that bridge so authorized, is apt and appropriate, when we are asked to construe the ordinance of 1787 as denying to the government of the Northwest Territory a power so important to the welfare of its people. Upon this he said:

"But the object and end of all government is to promote the happiness and prosperity of the community by which it is established; and it can never be assumed, that the government intended to diminish its power of accomplishing the end for which it was created. And in a country like ours, free, active, and enterprising, continually advancing in numbers and wealth, new channels of communication are daily found necessary, both for travel and trade, and are essential to the comfort, convenience, and prosperity of the people. A State ought never to be presumed to surrender this power, because, like the taxing power, the whole community have an interest in preserv-

ing it undiminished. And when a corporation alleges, that a State has surrendered for seventy years, its power of improvement and public accommodation, in a great and important line of travel, along which a vast number of its citizens must daily pass; the community have a right to insist, in the language of this court above quoted, 'that its abandonment ought not to be presumed, in a case, in which the deliberate purpose of the State to abandon it does not appear.' The continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation; and the functions it was designed to perform, transferred to the hands of privileged corporations. The rule of construction announced by the court, was not confined to the taxing power; nor is it so limited in the opinion delivered. On the contrary, it was distinctly placed on the ground that the interests of the community were concerned in preserving, undiminished, the power then in question; and whenever any power of the State is said to be surrendered or diminished, whether it be the taxing power or any other affecting the public interest, the same principle applies, and the rule of construction must be the same."

Nor should the particular language of the article above set out be given a narrow or hypercritical meaning. The plain purpose was but to limit the general right of eminent domain by the requirement that compensation should be made. A public "exigency" exists, for the "common preservation," when the legislature declares that for a bona fide public purpose there should be a right of way for a common carrier across a particular piece of property. The uses to which § 3283–a authorizes a condemnation of a right of way are undeniably public and not private uses. When that is the case, "the propriety or expediency of the appropriation cannot be called in question by any other authority." *United States* v. *Jones,* 109 U. S. 519.

It follows then, first, that the legislative power of the State of Ohio was not restricted in any way by the provisions of the second article of the ordinance of 1787 after its admission to the Union, and it has every power of eminent domain which pertains to other States, unless limited by its own constitution; and, second, that if the law of eminent domain as it existed at the time of the dedication is to be read into the contract, that that law, properly interpreted, was not such as to forbid an appropriation such as is here involved.

The judgment of the Supreme Court of Ohio must, therefore, be

*Affirmed.*