## DALCHE et al. v. BOARD OF COM'RS OF ORLEANS LEVEE BOARD et al.
### No. 20395.

District Court, E. D. Louisiana, New Orleans Division.

Feb. 9, 1931.

See, also, 46 F.(2d) 340.

Pierre D. Olivier, Paul W. Maloney, Jewell A. Sperling, and D. A. McGovern, Jr., all of New Orleans, La., for plaintiffs.

James Wilkinson, N. H. Polmer, and George Piazza, all of New Orleans, La., for defendants.

DAWKINS, District Judge.

Richard Dalche, alleging himself to be the administrator "of the consolidated successions of Nicholas La Vergne et als, No. 92,-666, and Alliam La Vergne, et al, No. 92,-924," on the docket of the civil district court for the parish of Orleans, and more than two hundred other individuals, alleging themselves to be heirs of Jean La Vergne, Sr., "who died December 1st, 1774," bring this suit against the levee board of Orleans parish, and Weil, Roth & Irving Company of Cincinnati, Ohio, claiming ownership of certain property, amounting to approximately thirty-seven acres, bordering on the shore of Lake Pontchartrain, in said parish, and allege in detail the means by which the property was acquired from their said ancestors; that the defendant levee board had admitted, in a certain suit in the civil district court for the parish of Orleans, that the property which it was "endeavoring to mortgage as collateral security for these bonds, was in the ownership of and belonged to petitioners herein"; and that its sole purpose was the placing of petitioners' property on the market to be sold, leased or otherwise disposed of at a price of not less than thirty cents per square foot, which petitioners allege is "a violation of their constitutional rights."

I quote from the petition as follows:

"V. That, your petitioners, by reason of the aforesaid, have the right to be protected in the ownership of said property, and to have declared null, void, and of no effect, the said Act 292 of 1928 of the Constitution adopted at the General Election by the voters of this State, on November 6, 1928, and Section 2 of Article 16 of the Constitution of this State, the said Constitutional amendments and laws being repugnant and violative of the provisions of articles 4 and 5 of the Amendments of the Constitution of the United States for the protection of which your petitioners humbly pray for relief, herein, insofar as the taking of your petitioners' property is concerned by the so-called and arbitrary method of appropriation."

"VI. Now, your petitioners specially aver that they are made secure in the ownership of their property rights by the express provisions of said Articles 4 and 5 of the amendments of the Constitution of the United States, and particularly against any so-claimed right of appropriation without due process of law as distinguished from expropriation as is set out in the said Act 292 of 1928, Section 2, Article 16, and the amendment of 1928 of the Constitution adopted at the General Election of the voters of this State on November 6, 1928, and some of them now live and have always lived outside of this State, and were not citizens thereof, as will be shown on the hearing, hereof."

"VII. That, the so-called work of reclamation on the part of the plaintiff, herein, is nothing more than a real estate speculation of an ingenious sort, and does not involve any work of a summary character, otherwise required by a necessity, the gravity of which would authorize the taking of private property for public purposes, upon payment thereof and for the benefit of the public weal —a contingency which is too far remote and removed to deserve the slightest consideration on the part of the Courts of this State and of the United States, especially as the property involved, belonging to petitioners, and intended to be taken by the plaintiff, under the scheme, aforesaid, was guaranteed by the Treaty of Sessions; proclaimed October 21, 1803."

"VIII. That, the plaintiff has never offered to your petitioners any adequate compensation for their property, have taken possession of it, and intended to be mortgaged under the financial scheme set out in our petition, and the ordinance, attached

thereto, and there exists no reason for the exercise of the police power of the State, either directly or indirectly by the plaintiff, a body politic created by Act 93 of 1890, and Act 79 of 1902 amending Section 6 of the said Act 93 of 1890, nor can the ownership of your petitioners' said property be affected by the so-called taxing power of the said Board, to be exercised in the event that the said financial scheme, for some reason should fail, the right of the said taxing power, being here, specially denied."

"IX. Petitioners further aver that the said Board of Commissioners was without authority to make any sale of the said bonds for the further reason that they were nōt properly and legally authorized so to do by the State Board of Liquidation, and the Minutes of the said Board are not sufficiently authoritative and comprehensive to warrant the sale, as will appear by a certified copy of the said minutes, hereto attached as part, hereof."

"X. Petitioners further aver that, notwithstanding, that the said Board of Commissioners was without authority to make any sale of the said bonds, they have nevertheless, after the rejection of bids called for on July 8, 1930, proceeded to make private sale of the same to the amount of one million dollars to Weil, Roth and Irving Co., and the said Board has publicly proclaimed the fact of the said sale, and its intention to consummate the same although the same is illegal, null, and void, and to the consequent injury to petitioners in their ownership of their property which is described in the foregoing petition."

"XI. Petitioners further aver that Weil, Roth & Irving Co., is a corporation, domiciled in the city of Cincinnati, State of Ohio, codefendant herein, and, on account of such diversity of the citizenship, and because of the fact that this suit involves the construction of the Federal Statutes and Laws as well as the conflict between the same and the State and Federal Constitutions, and the extent, force and effect to be given to the provisions of the Treaty of Sessions, proclaimed Oct. 21, 1803, this Honorable Court is seized of jurisdiction to adjudicate upon the issues, herein set out and petitioners further aver that the amount involved herein exceeds the sum of Three Thousand Dollars."

"Wherefore, the premises considered petitioners pray that said Board of Commissioners of the Orleans Levee District and Weil, Roth and Irving Co., of Cincinnati, Ohio, through their proper officers, be duly cited to

appear and to answer this petition and, after due proceedings had, that there be judgment in favor of your petitioners and against the said defendants decreeing petitioners to be the owners of the property described in the foregoing petition and further decreeing null and void the said sale of the bonds, described in the foregoing petition, and that there be, further judgment in their favor and against the said defendants denying the right of the said Levee Board to appropriate the property of your petitioners or to mortgage or to tax the same in any manner shape or form and to declare null and void and of no effect the said Act 292 of 1928, of itself, and as an amendment to the Constitution of 1921 adopted by the voters at an election held on November 6, 1928 as being violative of Arts. 4 and 5 of the Amendments to the Constitution of the United States and of the Treaty of Sessions proclaimed October 21, 1803."

"Petitioners further pray for all necessary orders, costs and for general relief."

Attached to and made part of this petition is what purports to be a copy of the minutes of the meeting of the state board of liquidation, authorizing the issuance of $2,-200,000 of "Pontchartrain Lake Front Improvement Bonds," for the purpose of building a sea wall around Lake Pontchartrain, in the locality in question. At said meeting it was agreed that five of said bonds should be sold "at private sale in order that a test case might be presented to the Supreme Court as to the validity of said bonds and of the right of the Board to increase its special levy of taxes from three mills to five mills, to guarantee the payment of the principal and interest thereon, the remainder of the issue of bonds to be sold at competitive bids, at public sale."

Defendant levee board excepted to the original petition of July 28, 1930, on the ground "that on the face of the papers, the petition and exhibits attached thereto, this court is without jurisdiction to entertain, hear, try and determine this suit"; that Dalche, administrator, "is an officer of the Civil District Court, whose domicile is in the Parish of Orleans"; that the petition does not disclose where the other plaintiffs reside, and while it is alleged the defendant Weil, Roth & Irving, is domiciled in Cincinnati, Ohio, no allegation is made as to the domicile of the levee board, although it was well known to plaintiffs and their attorneys that it was in the state of Louisiana; and, in as much as some of the plaintiffs are residents of the state of Louisiana and their domicile is the

same as that of the defendant Board, this court is without jurisdiction.

On July 29, 1930, an amended petition was filed, the pertinent portions of which are as follows:

"II. That your petitioners amend Articles 5 and 6, of the original petition to read as follows, to-wit:

"V. That, your petitioners, by reason of the aforesaid, have the right to be protected in the ownership of the said property, and to have declared null, void and of no effect, the said Act 292 of 1928 of the Constitution adopted at the General Election by the voters of this State, on November 6, 1928, and Section 2 of Article 16 of the Constitution of this State, the said Constitutional amendments and laws being repugnant and violative of the provisions of Articles 4, 5 and 14 of the amendments of the Constitution of the United States for the protection of which your petitioners humbly pray for relief herein, insofar as the taking of your petitioners' property is concerned by the so-called and arbitrary method of appropriation."

"VI. Now, your petitioners specially aver that they are made secure in the ownership of their property rights by the express provisions of said Articles 4, 5 and 14 of the amendments of the Constitution of the United States, and particularly against any so-claimed right of appropriation without due process of law as distinguished from expropriation as is set out in the said Act 292 of 1928, Section 2, Article 16, and the amendment of 1928 of the Constitution adopted at the General Election of the voters of this State on November 6, 1928, and some of them now live and have always lived outside of this State, and were not citizens thereof, as will be shown on the hearing, hereof."

"III. Petitioners further amend Article 8 of the original petition, to read as follows; to-wit:

"That, the plaintiff has never offered to your petitioners any adequate compensation for their property, taken possession of it, and intended to be mortgaged under the financial scheme set out in its petition, and the ordinance, attached thereto, and there exists no reason for the exercise of the police power of the State, either directly or indirectly by the said Levee Board a body politic created by Act 93 of 1890, and Act 79 of 1902 amending Section 6 of the said Act 93 of 1890, nor can the ownership of your petitioners' said property be affected by the so-called taxing power of the said Board to be exercised in the event that the said

financial scheme, for some reason should fail, the right of the said taxing power, being here, specially denied."

A second amended petition was filed on August 6, 1930, from which I quote as follows:

"II. That they aver and show that the Levee Board has publicly and judicially declared that the property of your petitioners has been appropriated not for public uses, but for the purposes of mortgaging and selling the same, the former with a view of raising money to exploit a financial scheme and the latter to permit it to indulge in speculation by converting it into building sites upon which residences can be erected, and possession enjoyed by the purchasers to the consequent injury and damages to your petitioners who will be forced to sit idle by while this process of confiscation is going on for the benefit of individuals other than your petitioners, the true and lawful owners of the property involved in this proceeding."

"IV. That, under the terms of the ordinance, forming part of the proposed sale of bonds, to be secured by mortgage on the property of your petitioners, it is expressly set out, therein, that the property will be sub-divided into residential sites and sold by the Levee Board and its use will not be limited to public purposes such as parks, streets, etc., but on the contrary, extended for private exploitation and confiscation insofar as any rights of your petitioners are concerned, which the Levee Board has refused to recognize in any manner, shape or form in its present scheme of speculation with the property of your petitioners as the only asset, although it has, in other judicial proceedings, and in the instant one, admitted the ownership in petitioners, insofar as title is concerned, but no further."

"V. That the State has no right, either directly or indirectly, to take the property of an individual as has been attempted here, and turn it over to another individual no matter what might be the method of transmission and any such claim as is here proposed by the Levee Board is illegal, null and of no effect."

"VI. That all of the acts and things charged herein, in the foregoing articles on the part of the said Levee Board, constitute an invasion of the Constitutional rights of your petitioners and a direct and positive violation of the 14th Amendment, Section 1, of the Constitution of the United States, and should be so declared by judgment of this Honorable Court."

Thereafter, both defendants excepted to the amended petitions, on the ground that the court, after the original exception to the jurisdiction had been filed, "was without jurisdiction, power or authority to permit the filing of said supplemental and amended petitions until the question of its jurisdiction was determined"; "* * * that this court cannot entertain on the law side of this court a petition for injunction which could only be urged on the equity side of the court."

The exceptions were submitted, and the amendments were allowed. The plea to the jurisdiction was overruled for the reason that, although the petition discloses some of the plaintiffs and the defendant levee board were both citizens and residents of this state and district, and the pleadings of the petitioners were inartificially drawn, still, when analyzed, they constituted an attack upon an amendment to the state Constitution as being in conflict with the Fourteenth Amendment to the federal Constitution, and hence the court had jurisdiction to determine the matter without regard to the citizenship of the parties. See opinion (D. C.) 46 F.(2d) 340. This opinion, passing upon the plea to the jurisdiction, was filed August 28, 1930, and on the following day the defendants appeared and filed a plea, which they denominate "Exceptions, Answer and Rejoinder to Plaintiffs' Bill in Equity," addressing the court "sitting as a court of equity." They first reiterated their former exceptions and alleged that the supplemental petition changed the issues and violated the rules of equity practice, and that the petition did not disclose a cause of action "known to the laws of this state or of the United States." Defendants admitted the capacity of Dalche, as administrator, and the heirship of the other plaintiffs; denied some of the allegations with respect to the acquisition of title, and that the property was worth the amount alleged as its value. Other allegations were denied, particularly the claim that Act No. 292 of 1928, adopted as an amendment to the state Constitution, was invalid under Amendments 4, 5, and 14 of the federal Constitution. Defendant levee board further averred that it "had the right to take over and appropriate the said property for the protection and welfare of the residents of the city of New Orleans, and to fill up the stagnant water and foreshore situated behind the said levee for the purpose of perfecting the drainage system of said levee, and to abolish a nuisance and prevent disease in the city of New Orleans, and in the event and after the final appropriation of said property and improvements thereof, to mortgage and sell the same so as to provide means to partially pay for said improvements and to prevent the location of shacks and hovels in the rear of said park, authorized by said constitution, behind the levee"; that no demand was ever made by plaintiffs for compensation "and the only attempt ever made by the plaintiffs was to recover the property in its improved condition without tendering the costs or any part of same, in changing the character of this property, from the bottom of the lake or the unhealthy marshy foreshore of the lake to a clean, salubrious tract of land, and that this suit is one to hamper, annoy and delay your respondents in the completion of said vast improvement in the hope that your respondents may offer something beyond the petty amount which your plaintiffs might obtain as the value of their alleged holdings."

Defendants further alleged in part as follows:

"That respondents will shortly take over and fill several lots of small value claimed by the plaintiffs situated in the rear part from what is known as Spanish Fort, and which has been covered with high water from the high tides of the lake, and has been willing to compensate the plaintiffs on proof of their ownership and of the value of the property, for whatever sum it may be worth, but that the said plaintiffs have never offered said proof or stated said value and the monstrous pretentions of the said plaintiffs as to the said alleged value of their holdings proportionately would make the reclamation of the lake front impossible. * * *"

"And further answering your respondents say that the aforesaid Constitutional Amendment, Act No. 292 of 1928, is good, legal and valid in every respect and that any other issues set up in this cause which are not pertinent thereto cannot be passed upon by this Court and that the decision of the constitutionality of said Article will carry with it a dismissal of all other matters and things set up in this cause."

Defendants prayed that their exceptions be maintained, plaintiffs' suit be dismissed, "and that Act No. 292 of 1928 adopted, as a constitutional amendment of the state of Louisiana be declared legal and valid in every respect. * * *"

At the instance of the defendants, the case was set for trial on November 25, 1930. On that date, after hearing statements and arguments of counsel, plaintiffs seeking to have it continued, the court concluded that

the cause was one properly cognizable in equity, and accordingly transferred it to the equity side of the court, plaintiffs objecting and their exceptions being noted. A special master was then appointed to hear and report upon the evidence, to which plaintiffs also reserved an exception.

During the hearing before the master, plaintiffs filed a plea of estoppel, alleging that, through one of the defendants' witnesses, it had proven that the property was worth more than $3,000, and the levee board, through its president, had admitted that it had appropriated and taken possession of the property "and intended to parcel it out and sell it to private investors for the purpose of erecting homes upon it, at a price of not less than thirty cents per square foot, without any compensation previously paid to petitioners as owners * * * and in consequence of said admissions, * * * together with that of the ownership of the property in petitioners," defendants were estopped from "contesting either the value * * * or the purpose of such appropriation," and should not be permitted to proceed further. ·They attempted to have the hearing stopped, but the court declined to follow that course.

On December 8th, counsel for defendants filed what were termed "Peremptory Exceptions of Res Adjudicata and Estoppel," in which "the defendant" excepted to that portion of plaintiffs' claim, west of the Old Spanish Fort levee, "comprising ninety percent of the area claimed by plaintiffs," as follows:

"That in the suit of Arthur Lavergne, et al. v. Board of Commissioners of the Orleans Levee District, No. 67,858 of the Civil District Court of the Parish of Orleans, Division 'E', the said plaintiffs herein brought an ejectment suit against defendant, and in said suit set up and made a part of the record, that the appropriation thereof under the provisions of the Constitution of this State were in violation of the Constitution of the United States, and the taking of private property for a private purpose all without due process of law."

"That said cause was heard and determined by the Hon. W. H. Byrne, Judge of said Court, all in accordance with the judgments and opinions made a part of this exception. Certified copies being attached hereto."

"That said judgments specifically overruled plaintiffs attack on the Constitutional provisions of this State relied on by defendants, and that said judgment unless reversed on appeal to the Supreme Court of the State of Louisiana is binding and Res Adjudicata against plaintiffs and they are estopped from urging any such Constitutional attack in this case."

█ It has been necessary to make this long statement of the pleadings and developments of the case in order to clearly show its nature. I think the plaintiffs have proven their ownership of all that portion of the property claimed, which is above 20.7 Cairo datum, the remainder being a part of the bed of Lake Pontchartrain. The plea of res judicata cannot be sustained, since it appears the decision was by the trial court of the state, from which appeal was prosecuted, and the case is not final.

█ An analysis of the original bill and its prayer, as well as the amendments, discloses that, while not specifically alleged, the proceedings taken by the levee board for the appropriation of the property under Act No. 292 of 1928, adopted as an amendment to the state Constitution, amounted to a cloud upon plaintiffs' title, and the substance and effect thereof can be construed in no other way; and, when considered in connection with the prayer for judgment "decreeing petitioners the owners of the property * * * and further decreeing null and void the sale of the bonds * * * and that there be judgment * * * denying the right of the said Levee Board to appropriate the property of your petitioners or to mortgage or tax the same in any manner, shape or form, and to declare null and void and of no effect, the said Act No. 292 of 1928, of itself and as an amendment to the constitution of 1921 * * * as being violative of articles 4, 5 and 14 of the Amendments to the Constitution of the United States, and of the Treaty of Sessions, proclaimed October 21, 1803," it seems clear that the demand was for the removal of this cloud from the title and the prohibiting or enjoining of the levee board from carrying out the proceedings which it had undertaken pursuant to the said amendment to the state Constitution.

My view is, therefore, that the cause was properly transferred to the equity side of the court.

█ The case has been presented in a manner very much confused, but, overlooking the inartificial character of the pleadings and the way in which it has been handled, I believe that the principal issue is as to whether the plaintiffs have shown any violation of the

provisions of the Fourteenth Amendment to the federal Constitution, in that their property has been taken for a private purpose. Needless to say, the Fourth and Fifth Amendments have no application, for it has been held repeatedly that they are restraints upon agencies of the federal government only, and can not be invoked against the state or its subdivisions.

If the levee board has taken plaintiffs' property for a private purpose, the due process clause of the Fourteenth Amendment has been violated. Missouri Pacific Ry. Co. v. Nebraska, 164 U. S. 403, 17 S. Ct. 130, 41 L. Ed. 489. The right of a state itself, or through its subdivisions, to appropriate or expropriate private property for public purposes, is inherent, and without which it could not well perform its functions. This power is not affected by the Fourteenth Amendment, if it be exercised with due process of law and provision be made for compensation. City of Cincinnati v. Louisville & Nashville R. Co., 223 U. S. 390, 32 S. Ct. 267, 56 L. Ed. 481. The federal courts are vested with the duty of determining for themselves what is due process under this amendment, and are not bound by the rulings of state courts thereon. Rindge Co. v. Los Angeles County, 262 U. S. 700, 43 S. Ct. 689, 67 L. Ed. 1186; Milheim v. Moffat Tunnel Improvement District, 262 U. S. 710, 43 S. Ct. 694, 67 L. Ed. 1194. So that, in the present case, the all-important question is as to whether or not plaintiffs' property is being taken for a public use in the sense that it is to be devoted to or disposed of for the benefit of the general public or that part of it to be affected by the scheme.

The Louisiana Legislature, having conceived a plan for the reclamation and improvement of a portion of the shore and adjacent lands bordering on Lake Pontchartrain, within the city of New Orleans, and for the building of a levee or sea wall for the protection of the inhabitants of that city, submitted the scheme, in the form of an amendment to section 7 of article 16 of the state Constitution, to the people, and it was duly adopted at the general election in November, 1928. The joint resolution is found on page 578 of the Acts of the Regular Session of the Louisiana Legislature of 1928, No. 292, and reads as follows: "A joint resolution proposing an amendment to Section 7 of Article XVI of the Constitution of Louisiana, as amended by Act No. 106 of the Legislature of 1922, subsequently approved as an amendment to the Constitution of Loui-siana, granting to the Board of Levee Commissioners of the Orleans Levee District certain rights, powers, duties, authority and jurisdiction in, along and over and pertaining to the shores, bed and bottom of Lake Pontchartrain, within certain limits in the Parish of Orleans, authorizing and empowering said Board to do and perform certain works of reclamation, construction and improvement thereon and on other lands acquired or to be acquired by said Board in connection therewith; authorizing and empowering said Board to sell, lease, and otherwise dispose of, all or any part of said lands and improvements not dedicated to public use, and to construct and operate places of amusement and recreation in connection therewith; to issue bonds, notes and certificates of indebtedness, and to secure same by mortgage and pledge; creating a sanitary district and defining the powers and duties thereof."

The language thus quoted forms the title to an act approved July 20, 1928, and found at page 35 of the Supplement to the Acts of the Legislature of 1930, embracing the amendment to the Constitution, certified by the secretary of state as having been adopted at the election held on November 6, 1928. The first section of this act declares that, "subject to the adoption of the proposed amendment," the said section 7 of article 16 of the Constitution, as amended by Act No. 106 of 1922, which had also been adopted as an amendment to said provision of the Constitution, should be amended "so as to read as follows": Subsection (a), § 1, declares: "(a) The Board of Levee Commissioners of the Orleans Levee District shall have and exercise all and singular the powers now conferred upon said Board by law, as well as such powers as are herein granted. Said Board shall have full and exclusive right, jurisdiction, power and authority to locate, relocate, construct, maintain, extend and improve levees, embankments, seawalls, jetties, breakwaters, water-basins, and other works in relation to this project, and to conduct all dredging operations necessary in connection therewith and/or incidental thereto, along, over and on the shores, bottom and bed of Lake Pontchartrain in the Parish of Orleans from its western boundary to the boundary line separating township 11 south, range 12 east, from township 11 south, range 13 east, at a distance not to exceed three miles from the present shore line, as the said Board may determine, and along and on the shores adjacent to said lake and along the canals connected therewith; the said levees, embankments, sea-walls, jetties, breakwaters, water-

basins and other works to be of such character and extent and of such height, width, slope, design and material as said Board may determine, with power and authority to improve and to protect the same with such other structures as may be deemed necessary and proper by said Board. * * *"

The plan was made, subject to approval by the board of state engineers, as to its soundness.

Subsection (b) further declares that the board shall have authority and be under the duty to "execute, maintain and administer all of the works, and all of the phases of the project and improvements undertaken hereunder"; and that, for the purposes of construction, the area should be divided into five zones and the work thereon prosecuted consecutively.

Subsection (c) is quoted in full, as follows: "(c) In planning, designing and executing of said project, the said Board shall have jurisdiction, power and authority, within the territorial limits of said project to dedicate to public use and to lay out, construct, embellish and maintain a system of parks, beaches, tracts of land and streets, with the necessary and related or unrelated buildings, and the usual adjuncts to the kind of development contemplated hereunder; to construct and equip and maintain playgrounds, places of amusement and entertainment, golf links, gymnasiums, swimming pools, bathing beaches, aviation fields and other like places."

Subsection (d) authorizes the board to contract with the sewer and water board of the city of New Orleans, and with any other public utility, for the financing and construction of water, sewerage, and drainage facilities and other utilities.

Subsection (d) declares that the board may acquire, "by donation, purchase, exchange, expropriation, or *appropriation,* * * * any private property" (italics by the writer of this opinion), within certain boundaries, and, further, that: "In the event of expropriation or appropriation the compensation to be paid shall be the actual cash value of the property before the contemplated improvement was proposed and begun; provided, that nothing contained herein shall require the said Board to pay for any lands taken for purposes other than the Lakefront improvement project herein contemplated any greater compensation, than that provided by Section 6 of Article XVI of this Constitution."

Subsection (f) is unimportant to this case, and subsection (g) merely provides that the work shall be done by letting contracts, according to law.

Subsection (h) declares that, to enable the board "to perform the work herein provided for and to assist in defraying the cost and expenses thereof," there is granted and released to the board "the title of the State in and to all public property necessary for the purposes hereof and all lands reclaimed or filled in within any levee embankments, slopes, retaining walls, sea walls, and breakwaters constructed hereunder and in and to all lands lying within the territorial limits of said project and hereby releases said land from any public trust or dedication and said Board shall have jurisdiction, power and authority to sell and lease, or sell or lease, or otherwise dispose of such portion of the lands reclaimed and other property acquired for the purpose of said improvement except the land herein required to be dedicated by it for public use," on such terms as it may deem proper, "and to establish and impose such servitudes, restrictions, rules and regulations as to such lands sold and leased, or otherwise disposed of as said Board may determine; provided that said lands may be subdivided in lots and may be offered for sale or lease or sold or leased as soon as practicable after the adoption of the amendment without awaiting the completion of said project," but that none of said lands should be sold for less than 30 cents per square foot and with the further restriction that none should be sold "until its general plan with respect to selling, leasing, or otherwise disposing of said land" had been approved by a majority of the members of a commission composed of persons appointed by the Orleans Real Estate Exchange, New Orleans Clearing House, the New Orleans Association of Commerce, the commission council of the city of New Orleans, and the board of liquidation of the state debt; and, further, that there should "be reserved and dedicated forever by said Board for public parks, parkways, boulevards, play-grounds and places of amusement and beach purposes, exclusive of roads and streets, an area, or areas, comprising not less than thirty (30%) per cent. of the total land area of the project; and provided further that along the entire Lake Pontchartrain frontage of the project there shall be reserved and dedicated forever by said Board for public parks, parkways, boulevards, play-grounds, aviation fields and/or places of amusement and/or beach

purposes, a continuous strip of land averaging at least 500 feet in depth and at no point less than 350 feet in depth. * * *"

This subsection further authorizes the employment of agents "for the sale and disposal of the said property," and that their compensation shall be fixed by the levee board at a rate not to exceed the maximum in force by the Orleans Real Estate Exchange.

Subsection (i) is quoted, as follows:

"(i) In order to carry out the objects and purposes of this section and to enable said Board to finance and carry on the work of development, improvement, maintenance and operation herein authorized, or otherwise authorized by law, said Board is authorized and empowered, and shall have the authority and power, to issue, sell and deliver, from time to time bonds, notes and/or certificates of indebtedness, not exceeding Fifteen Million Dollars ($15,000,000.00) in aggregate principal amount at one time outstanding, to be signed in its behalf by its duly authorized officers, to be payable in gold coin of the United States of America of the weight and fineness existing at the date thereof or its equivalent, to bear such rate of interest not to exceed 6% per annum, to be payable at such times and at such place or places, and to be issued under all such terms and conditions not inconsistent herewith, as said Board may determine; and to secure such bonds, notes and/or certificates of indebtedness, at any time issued, or to be issued, and outstanding, but not to exceed the sum of $15,000,000.00 principal amount at any one time outstanding, the said Board is authorized to mortgage and pledge.

"(1) Any and all lands reclaimed, or to be reclaimed, or otherwise acquired by said Board as part of said development, except such part of such land as is required by the provisions hereof to be reserved and dedicated for public parks, parkways, boulevards, playgrounds and/or places of amusement, and/or beach purposes, together with all buildings and improvements made or constructed, or to be made or constructed thereon, and all rights, ways, privileges, servitudes or appurtenances thereunto belonging or in anywise appertaining, and

"(2) Cash, notes and/or other evidences of indebtedness received, or to be received, by said Board in consideration for the sale or sales, of any lands, lots and improvements forming part of said development; and

"(3) Any lease or leases, and the rents, incomes and other advantages, arising out of any lease or leases, made or granted by said Board in connection with said development; and

"(4) Generally any and all rights of said Board in and to any lands, property, incomes, revenues, claims, and other choses in action, forming part of and/or arising out of said development."

Subsection (j) requires that no part of the bonds or other evidences of debts shall be negotiated or money borrowed except upon the approval of three-fourths of the members of the state board of liquidation. The total amount of indebtedness outstanding at one time, including bonds, obligations on contracts, etc., is fixed at a maximum of $15,000,000.

Subsection (k) declares that: "The provisions hereof are self-executing and the Board of Levée Commissioners of the Orleans Levee District is authorized and empowered to carry same into effect."

The statute then proceeds to create a sanitary district, to include the parishes of St. Charles, Jefferson, and Orleans, under the name of the Lake Pontchartrain sanitary district, to be governed by a board of eleven members, selected by the police juries of said parishes, the Jefferson drainage district, city board of health, the sewerage and water board of New Orleans, the levee commissioners of the Orleans parish levee district, and the board of port commissioners of New Orleans. This board is then authorized to prevent the pollution of the waters of Lake Pontchartrain by the adoption of rules and regulations covering the discharge of drainage, sewerage, and trade waters, into the lake and into the canals or channels which empty into it, within the limits of said parishes. Further provision is also made for the organization, control, and functioning of said board, with the right reserved by the Legislature to confer upon it additional powers.

This extended analysis of the statute and constitutional amendments has been made for the purpose of showing the character of the project and the procedure by which it is to be carried out. Its validity has been submitted to and sustained by the Supreme Court of the state in a suit by another owner of property within the area affected. New Orleans Land Co. v. Board of Levee Commissioners of Orleans Levee District, 132 So. 121, being No. 30,718, on the docket of that court, and decided December 1, 1930. See, also, Board of Levee Commissioners v. Whitney Trust & Savings Bank, 171 La. 28, 129 So. 658.

■ The action of the Legislature and its approval by the people through constitutional amendment is conclusive evidence of the necessity for the taking of the property, and while the federal courts, as previously stated, are not bound by the declaration of the Legislature or decisions of the state courts as to the public character of the purpose for which the property is taken, within the meaning of the Fourteenth Amendment, still a determination of that issue is necessarily influenced by local conditions, and the national courts "should keep in view the diversity of such conditions and regard with great respect the judgments of state courts upon what should be deemed public uses." Rindge Co. et al. v. County of Los Angeles, 264 U. S. 700, 43 S. Ct. 689, 692, 67 L. Ed. 1186; Milheim v. Moffat Improvement District et al., 262 U. S. 710, 43 S. Ct. 694, 67 L. Ed. 1194.

The record shows that the project involved here has two main purposes, to wit, the building of a levee or sea wall to protect the city of New Orleans from inundation by the waters of the lake, which will be greatly increased at flood stage of the Mississippi river because of the discharge from the spillway now being constructed by the government engineers at Bonnet Carre; and, secondly, to reclaim a portion of the lake bottom and the low marshy lands adjacent thereto. The scheme contemplates the conversion of the area so reclaimed and protected into a desirable residential section, with a passageway on the front next to the sea wall of an average width of five hundred feet, permanently dedicated to public use; and that at least 30 per cent. of the entire property, exclusive of roads and streets, shall be likewise dedicated to the public for parks, parkways, boulevards, playgrounds, places of amusement, beach purposes, etc. Several million dollars have already been expended upon the work, and there has been and will be, in some of the zones, considerably more than 30 per cent. of the property used for the purposes above mentioned. The undertaking also contemplates efficient drainage and the prevention of pollution of the waters of the lake, canals, and other channels emptying into it, so as to render the shore and beach a healthy and attractive place for public boating, bathing, etc. The result will also be to eliminate the marshy areas and low places for the breeding of mosquitoes and other disease-bearing insects, and thereby to benefit materially the health and comfort of the city and especially this particular section.

All of the property claimed by plaintiffs, except approximately four acres, is of a low, swampy character, and below Cairo datum 20.7, insusceptible to use for residential or business purposes other than the trapping of muskrats, etc. It and the other property within the district similarly situated will have the surface raised several feet by pumping sand in from the lake, at an approximate cost of 10 cents per square foot, or $360 for the average city lot of 30'x120'. In its natural state, the value is small compared to what it will be when the work has been finished.

■ The state, through its proper agency, undoubtedly has the right, both under its police power for the protection of the citizens of New Orleans from the waters of the lake, and as a matter of health and comfort, to build the levee or sea wall and to drain and fill in these marshy lands; and, by virtue of its sovereignty, can condemn and appropriate the property necessary for streets, parks, parkways, playgrounds, for amusement purposes, etc. For either purpose it could levy general taxes, within the limits of the state Constitution, to pay bonds or other obligations issued to that end. In the nature of things, it would have been impracticable to carry the plan through on the comprehensive scale contemplated, without having control of the whole area. The location of parks, playgrounds, amusement centers, streets, etc., had to be determined with relation to each other in a manner calculated to best meet the needs and requirements of the public. With the large number of claimants to the approximately 2,000 acres involved, to have proceeded by separate condemnation suits, as and when the project progressed, would not only have made the cost prohibitive, but would doubtless have deterred the Legislature from initiating it altogether. The scheme was conceived as a matter of legislative judgment, approved by constitutional amendment, and although portions of the property may be, after reclamation and improvement, sold to private persons, the entire proceeds will be used to pay the cost of its execution or other public purposes. The board is a state agency, all of whose revenues are devoted to levee building or similar public needs. It is supported by taxation and cannot contribute one penny to private persons or enterprises.

■ In determining the question of whether the object in appropriating property by a state agent is a public one, not prohibited by the Fourteenth Amendment, the courts may consider the circumstances and

conditions peculiar to the locality in which the taking is sought. In addition to the evidence in this record, it is a matter of common knowledge that much of the land along the shore and adjacent to Lake Pontchartrain in the city of New Orleans and parish of Orleans, is of a low swampy nature, not susceptible to human habitation or cultivation without drainage or other artificial reclamation, through the ingenuity of man. Hence the project under consideration here cannot be viewed in the same light as would be done if it was undertaken in a locality where the property was not so situated. See Clark v. Nash, 198 U. S. 361, 25 S. Ct. 676, 49 L. Ed. 1085, 4 Ann. Cas. 1171. No single individual owning property in an area like the one now under consideration could afford to reclaim it by the means necessary and to be used by the defendant levee board. Must it, for this reason, remain undeveloped, as well as a menace to the safety and health of a large city? I think not.

Having found that the appropriation is for a public purpose, does the law make reasonably certain and prompt provision for payment? In the first place, plaintiffs do not allege that the levee board has not made provision for or is unable to pay for the property. However, it is seen from the above-quoted language of the last sentence of said subsection (e) that "in event of expropriation or appropriation the compensation to be paid shall be the actual cash value of the property before the contemplated improvement was proposed and begun. * * *" Subsection (h) grants to and authorizes the board to use all the property belonging to the state within the district, "to assist in defraying the cost," and subsection (i) authorizes the issuance of not more than $15,000,000 of bonds "to carry out the objects and purposes of this section and to enable said Board to finance and carry on the work of development, improvement, maintenance and operation herein authorized. * * *" Should the plaintiffs and the board be unable to agree upon the value of the property, it may be sued and the other judicial processes of the state are available to compel payment. See section 3, Act No. 93 of the Legislature of 1890. The amendment to the Constitution authorizes the board to acquire the property within the district, either by expropriation or appropriation. Of course to appropriate it means that the board may take possession, if it has made provision for paying the value of the property, and reasonably adequate procedure is afforded for the determination and collection of the sums due to the proprietors. In this case the board has proceeded by appropriation, and there being not only no constitutional provision against that course, but the same being specifically authorized by the amendment under consideration, it may proceed in that manner and leave the owner to his remedy under the law. See Bickham v. Shreveport, 156 La. 648, 101 So. 8.

Under the view I have taken, it is not necessary to go into the mass of evidence upon the character and value of the property. Plaintiffs have asked for no judgments therefor, and such a claim could not be considered in a proceeding of this nature. Having construed it as a bill in equity, to quiet the title to the property and to enjoin the defendants from proceeding with the scheme of reclamation, and finding that that contention is not sustainable under the law, it results that the demand should be rejected and the suit dismissed at the cost of the complainants. Their right to proceed in a proper tribunal for the recovery of the value of their property will be reserved.

Proper decree may be presented and the rights of all parties to present and have settled exceptions or other matters necessary to the perfecting of an appeal are reserved.