**Fred and Dorothy JOINER et al.**

v.

**CITY OF DALLAS et al.**

**No. CA 3–4322–B.**

United States District Court,
N. D. Texas,
Dallas Division.

Aug. 16, 1974.

Jay M. Vogelson, Dallas, Tex., for plaintiffs; Charles J. Morris, John E. Kennedy, John F. Jordan, Aglaia D. Mauzy, Dallas, Tex., of counsel.

N. Alex Bickley and Joseph G. Werner, Dallas, Tex., for defendants City of Dallas, Wes Wise (Mayor), City Council of Dallas, George Schrader (City Manager), Park Board of Dallas, and Alex Bickley (City Attorney).

John W. Clark, Jr., Dallas, Tex., for defendant State Fair of Texas.

John W. Clark, Jr., Dallas, Tex., for defendant Robert B. Cullum.

John Hill, Atty. Gen., and Max P. Flusche, Asst. Atty. Gen., for intervenor State of Texas.

Before GOLDBERG, Circuit Judge, and HUGHES and HILL, District Judges.

## OPINION OF THE COURT

### PER CURIAM:

Threatened with loss of their homes and property, plaintiffs have come to this court for help in stopping the municipal bulldozer. They present a multifaceted challenge to the constitutionality of Vernon's Tex.Rev.Civ.Stat.Ann. arts. 3264–3271, which outline the statutory procedure governing the appropriation of property through eminent domain, and art. 6081e, which grants to municipal corporations the authority to commence eminent domain proceedings for various purposes. They urge condemnation of these statutes for violating the strictures of the Due Process and Equal Protection Clauses of the Fourteenth Amendment and for permitting the appropriation of private property without just compensation. Finding ourselves inextricably bound to well-settled interpretations of the doctrine of eminent domain and for other reasons set forth herein, we are obliged to hold these statutes constitutional and to deny the requested relief.[1]

### I.

In July 1968, the City Council of Dallas, Texas, approved a report submitted by the Park Board recommending the acquisition of realty in a geographic area locally known as "Fair Park." In August 1968, the City Council formally announced its intention to acquire the property that had become designated as the Fair Park Expansion Area ("FPEA"). By December 1968, the City had acquired title to about one-third of the FPEA properties. On July 28, 1969, the Park Board recommended to the City Council that eminent domain proceedings be initiated to acquire the remaining FPEA properties. Thereafter, the City Council declared by Resolution the necessity of acquiring by voluntary purchase or condemnation those properties.

During the period commencing July 1969, and concluding in early 1971, the remaining FPEA properties were either voluntarily sold to the City or cited by the City in eminent domain actions. As to that property sought to be acquired through eminent domain, a pattern of

---

1. Counts II through VI of the Amended Complaint seek money damages and supplemental injunctive relief for alleged violations of 42 U.S.C. §§ 1981, 1982, 1983, 1988, and specific constitutional rights. All these issues have been severed and will be tried subsequently before the district court in a single judge proceeding. Of course, we offer no comment on the validity or propriety of the remaining issues. Defendants may, at their option, reassert in the subsequent litigation any argument or defense submitted to this forum for adjudication in the context of the constitutionality of the challenged statutes.

conduct emerged in conformity with the eminent domain statutes:

(1) The City Council would pass a Resolution authorizing the acquisition of the property by purchase or condemnation;

(2) When the City and the property owner failed to agree on a sales price, the City would file a Statement in' Condemnation in a County Court at Law, Dallas County, Texas;

(3) The County Judge would appoint Special Commissioners in Condemnation to make a valuation of the property and to assess the damages arising from the condemnation;

(4) The Commissioners would conduct one or more hearings with advance written notice served on the property owner;

(5) The Commissioners would determine the amount of damages and would submit their Report to the County Judge;

(6) The City of Dallas would deposit in the registry of the County Court at Law an amount equal to the award rendered by the Commissioners; and,

(7) The property owner would file objections to the decision of the Commissioners within twenty days of the filing of their Report.

During the pendency of the State court eminent domain proceedings, Fred and Dorothy Joiner, together with twenty-eight other named plaintiffs, commenced this action in federal court.[2] Upon defendants' motion, the district judge dismissed the complaint, reasoning that property rights are not rights protected by the Civil Rights Act, that as a matter of comity the federal judiciary should not become involved in the interpretation and administration of a state's eminent domain statutes, and that even if comity did not require dismissal the anti-injunction statute precluded relief. Joiner v. City of Dallas, 329 F.Supp. 943 (N.D.Tex.1971). The Fifth Circuit affirmed in a *per curiam* opinion, 447 F.2d 1403 (5th Cir. 1971). The Supreme Court, however, vacated the judgment and remanded the case for further consideration in light of Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972); Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), and Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L. Ed.2d 669 (1971). Joiner v. City of Dallas, 412 U.S. 902, 93 S.Ct. 2286, 36 L.Ed.2d 967 (1973).

On remand, the Fifth Circuit, pursuant to *Mitchum*, held that the Civil Rights Act "was an express exception to the anti-injunction statute thus giving the District Court jurisdiction." Joiner v. City of Dallas, 488 F.2d 519, 520 (5th Cir. 1974). In addition, citing Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), the court held that the Civil Rights' Act must be construed as protecting property rights as well as personal rights. 488 F.2d at 520. Finally, the case was remanded to the district court with specific instructions to consider the potential applicability of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). 488 F.2d at 521. Thus, despite nearly four years of litigation, there still remains in issue the propriety of an exercise of jurisdiction by this court.

## II.

### A. YOUNGER V. HARRIS

An adjudication of the applicability of *Younger* requires a bifurcated analysis

---

2. When this action was commenced on November 24, 1970, the properties owned by the thirty named plaintiffs were in various stages of condemnation. Statements in Condemnation had been filed covering all properties. Moreover, each plaintiff had been personally served with notice of a Commissioners' hearing on the issue of damages. However, it was not until early 1971 that all hearings had been completed, the Commissioners award rendered, the Reports filed, and objections entered by the property owners.

of the *Joiner* State court litigation in order to ascertain whether (i) all of the *Younger* predicates exist, and (ii) the public policy considerations arising from a state court criminal prosecution that mandate abstention are correlative to an eminent domain proceeding. Unless both inquiries are answered in the affirmative, *Younger* does not require abstention.

Under Texas law the pending state court litigation is wholly civil in character, arising out of Vernon's Tex. Rev.Civ.Stat.Ann. art. 3266(6) and grounded in the objections filed by property owners to the Reports of the Special Commissioners in Condemnation. *See* Sabine River Authority of Texas v. McNatt, 161 Tex. 551, 342 S.W.2d 741 (1961). This characterization by the Texas judiciary is binding upon the federal forum. Polk v. State Bar of Texas, 480 F.2d 998, 1001–1002 (5th Cir. 1973). Therefore, the threshold inquiry is whether the *Younger* doctrine requires as a predicate to its application that the pending state court litigation be criminal in character.

Although the Supreme Court has not expressly resolved this issue, *Younger* has been applied by the Court only when the state court proceedings are criminal or "in the nature of criminal proceedings." Gibson v. Berryhill, 411 U.S. 564, 576, 93 S.Ct. 1689, 1696, 36 L.Ed.2d 488 (1973), *explaining* Geiger v. Jenkins, 401 U.S. 985, 91 S.Ct. 1236, 28 L.Ed. 2d 525 (1971). The Fifth Circuit has steadfastly enforced a similiar requirement that the pending state court proceeding form a nexus with the state's enforcement of its .criminal laws before *Younger* requires dismissal. Polk v. State Bar of Texas, 480 F.2d 998 (5th Cir. 1973); Duke v. State, 477 F.2d 244 (5th Cir. 1973); Palaio v. McAuliffe, 466 F.2d 1230 (5th Cir. 1972).

Palaio v. McAuliffe, *supra*, presented one example of this nexus; plaintiffs, who were under a state court civil injunction forbidding their exhibition of obscene movies and against whom criminal complaints were pending, sought termination of the injunctions and cessation of prosecutions because the state statutes were unconstitutional.

> We believe . . . that application of the principles of *Younger* should not depend upon such labels as "civil" or "criminal," but rather should be governed by analysis of the competing interests that each case presents.
>
> * * * * * *
>
> We thus pose a limited answer to the question . . . by holding that, where plaintiff is unable to prove the existence of "special circumstances," the principles of *Younger* bar federal intervention in a state civil proceeding that is an integral part of a state's enforcement of its criminal laws.

466 F.2d at 1232–1233.

Similarly, in Duke v. State, *supra*, 477 F.2d at 250–251, the nexus was found to exist by virtue of pending state court civil injunctions issued under statutes containing criminal penalties.[3] By contrast, the pending *Joiner* litigation bears no functional correlation to the criminal laws of Texas, thereby falling substantially short of the nexus required before *Younger* will apply.

Assuming *arguendo* that *Younger* applies to any pending state court proceeding regardless of its integration with a state's criminal laws, there is yet another missing predicate. *Younger* applies only if the federal forum is requested to restrain the pending state court proceeding. Plaintiffs in the case at bar have made no such request. The named defendants, although participants in the pending state court litigation, are

---

3. In oral argument, plaintiffs' counsel attempted to cite Allee v. Medrano, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) for authority that a pending state court civil injunction did not raise the specter of *Younger*. However, a careful reading of *Al-* *lee* shows the case does not dispose of that issue. The proceeding was remanded "for a determination as to whether there are pending prosecutions. . . ." at 820, 94 S.Ct. at 2202, 40 L.Ed.2d at 583.

not judicial officers, prosecutors, or judges. *See* Allee v. Medrano, *supra* n. 3, 416 U.S. at 817 n. 11, 94 S.Ct. at 2201 n. 11, 40 L.Ed.2d at 581 n. 11. Moreover, no injunctive relief is requested of this court that will affect the current proceedings; all injunctive relief is prospective in application.[4]

In concluding that *Younger* does not affect the exercise of jurisdiction otherwise properly invoked, we rely not only on the absence of the *Younger* predicates but also on the absence of traditional, established legal principles that would give rise to the doctrines of comity, equity and federalism. The *sine qua non* of *Younger* was the Court's belief in

> a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

401 U.S. at 44, 91 S.Ct. at 750. In holding criminal prosecutions to be state "functions" requiring abstention, the Court specifically acknowledged such abstention to be a doctrine "repeatedly followed and reaffirmed in other cases . . . ." 401 U.S. at 45, 91 S.Ct. at 751, *citing* Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927 (1926); Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941); Douglas v. City of Jeanette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).

■ In sharp contrast, the federal judiciary has traditionally entertained litigation on the propriety of condemnation despite simultaneous litigation in the state courts. *See* Allegheny County v. Mashuda Co., 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959); State v. City of Chattanooga, 264 U.S. 472, 44 S.Ct. 369, 68 L.Ed. 796 (1924); Joslin Mfg. Co. v. Providence, 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167 (1923); Trager v. Peabody Redevelopment Authority, 367 F.Supp. 1000 (D.Mass.1973) (Three-Judge Court). As stated by the Supreme Court in *Mashuda*:

> It is suggested, however, that abstention is justified on grounds of avoiding the hazard of friction in federal-state relations any time a District Court is called on to adjudicate a case involving a State's power of eminent domain . . . . But the fact that a case concerns a State's power of eminent domain no more justifies abstention than the fact that it involves any other issue related to sovereignty. Surely eminent domain is no more mystically involved with "sovereign prerogative" than a State's power to regulate fishing in its waters, Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460, its power to regulate intrastate trucking rates, Public Utilities Comm'n of California v. United States, 355 U.S. 534, 78 S. Ct. 446, 2 L.Ed.2d 470, a city's power to issue certain bonds without a referendum, Meredith v. Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9, its power to license motor vehicles, Chicago v. Atchison, T. & S.F.R. Co., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174, and a host of other governmental activities carried on by the States and their subdivisions . . . .

360 U.S. at 191–192, 79 S.Ct. at 1064–1065. When abstention has been required by the federal forum in an action involving state eminent domain statutes, it has been because the issue presented went beyond mere adjudication of the eminent domain statutes *per se* and concerned the apportionment of governmental powers between the state legislature

---

4. There is a request for an injunction ordering these defendants to "cause to be dismissed" the pending state court eminent domain litigation; however, the propriety of this relief is contingent upon other counts of the Amended Complaint and will be subse-

quently litigated in a single judge proceeding. Therefore, this court need not determine whether such relief, if granted, constitutes the restraint of a pending state court proceeding.

and the potential condemnor. *See* Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L. Ed.2d 1058 (1959).

*Joiner* poses no similiar problem. This court is not requested to construe unsettled issues of state law. Nor do plaintiffs contest the right of the State to exercise the power of eminent domain, the authority of the legislature to permit municipal corporations to initiate eminent domain proceedings, or any other issue that involves an adjudication of the powers of the State as a sovereign governmental entity. The rights plaintiffs allege to be infringed are wholly federal in origin and substance and, therefore, create no potential for federal-state friction.

■ We note also the *Younger* Court's reliance on abstention "to prevent erosion of the role of the jury and avoid a duplication of legal proceedings and legal sanctions where *a single suit* would be adequate to protect the rights asserted." 401 U.S. at 44, 91 S. Ct. at 750 (emphasis added). Abstention by this court will not, however, result in the maintenance of a "single suit" in state court. Texas property owners have the right to initiate a simultaneous collateral action in district court to enjoin condemnation proceedings under litigation in the County Court at Law. *See* Tonahill v. Gulf States Utilities Co., 446 S.W.2d 301 (Tex.1969); Webb v. Dameron, 219 S. W.2d 581 (Tex.Civ.App.—1949), writ ref. n. r. e.; Tod v. Massey, 30 S.W.2d 532 (Tex.Civ.App.—1930), no writ. In this collateral action, property owners may contest the constitutionality of state statutes. *See* Sabine River Authority v. McNatt, 161 Tex. 551, 342 S. W.2d 741 (1961); San Antonio v. Congregation, 404 S.W.2d 333 (Tex.Civ.App. —1966), no writ. Therefore, one justification for abstention—the avoidance of multiple litigation—will not be achieved should this court abstain from an adjudication of the constitutionality of these statutes. "The issue is simply referred to another forum . . . . Since

the federal courts are at least as adequate a forum, no real purpose would be served by denying a litigant his choice of a federal forum." Hobbs v. Thompson, 448 F.2d 456, 463 (5th Cir. 1970); *see also* Allegheny County v. Mashuda Co., 360 U.S. 185, 191, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959).

Because the *Younger* predicates are absent and because the instant case does not present sufficient policy considerations to justify abstention, we need not evaluate the merit of plaintiffs' claim that existing state court remedies are inadequate to afford property owners sufficient protection and that a danger of irreparable injury and damage exists.

## B. OTHER ABSTENTION ARGUMENTS

Regardless of the applicability of *Younger*, defendants contend that abstention is mandated under other well defined doctrines. On the basis of the history of the eminent domain statutes, the character of this litigation, and the relief requested, we are compelled to reject these other abstention arguments.

As the keystone of their abstention argument, defendants place primary reliance on Princess Lida of Thurn and Taxis v. Thompson, 305 U.S. 456, 59 S. Ct. 275, 83 L.Ed. 285 (1939), which established the principle that a federal court cannot exercise its jurisdiction to allocate trust assets, jurisdiction over which has been fixed in the state courts. Characterized as a "virtually mechanical rule," PPG Indust. Inc. v. Continential Oil Co., 478 F.2d 674, 676 (5th Cir. 1973), *Princess Lida* requires abstention only if:

(i) both the pending state court litigation and the litigation asserted in the federal forum are in rem or quasi in rem actions, and

(ii) the relief sought in the federal forum is relief that requires jurisdiction over the res, which is currently in the possession of the state court.

305 U.S. at 466, 59 S.Ct. 275.

Texas has provided a two-step condemnation process. The first step is the filing of a Statement in Condemnation under Vernon's Tex.Rev.Civ.Stat. Ann. art. 3264, which initiates a series of events culminating in a decision by the Special Commissioners in Condemnation regarding the value of the property sought to be condemned. The proceeding is effectively "against" the property *per se,* with jurisdiction over the res passing to the County Court at Law once the Statement in Condemnation is filed and the property owner duly notified. *See* City of Houston v. Kunze, 153 Tex. 42, 262 S.W.2d 947 (1953); Compton v. Texas Southeastern Gas Co., 315 S.W.2d 345 (Tex.Civ.App.—1958), *writ ref. n. r. e.* This phase of the condemnation proceeding is, therefore, an in rem action.

After the Special Commissioners in Condemnation have rendered their Report, however, the property owner may file objections in the County Court at Law naming the condemnor as the adverse party under Vernon's Tex.Rev.Civ. Stat.Ann. art. 3266(6). While the County Court at Law retains jurisdiction over the res during the pendency of that litigation, the proceeding in the County Court at Law "is simply an in personam suit to determine what the State must pay for the property it appropriates . . . ." Allegheny County v. Mashuda Co., 360 U.S. 185, 197, 79 S.Ct. 1060, 1068, 3 L.Ed.2d 1163 (1959). That continued jurisdiction over the res is not a prerequisite to an attack on the validity of the eminent domain proceeding is evidenced by the right of the land owners to maintain a simultaneous collateral injunctive action in the district court against further condemnation proceedings in the County Court at Law. *See, e. g.,* Tonahill v. Gulf States Utilities Co., 466 S. W.2d 301 (Tex.1969), Webb v. Dameron, *supra;* Tod v. Massey, *supra.* As previously noted, the constitutionality of state statutes may be attacked in the collateral proceeding. *See* Sabine River Authority v. McNatt, *supra;* San Antonio v. Congregation, *supra.*

It appears that all of the named plaintiffs in the case at bar have to this date proceeded from step one to step two; thus the pending state court litigation is not in rem or quasi in rem.

It is also clear that in this federal forum the instant litigation is not an in rem proceeding. The constitutional issues do not involve title to or possession of the property; they do not require jurisdiction over the res; and the full scope of relief requested can be effectively granted without infringing upon the state court's possession of the res. For these reasons, *Princess Lida* poses no opposition to the exercise by this court of its properly invoked jurisdiction.

Turning next to Railroad Comm'n v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), defendants argue that abstention is necessary because the Texas eminent domain statutes represent unsettled state law subject to state court interpretation that could effectively dispose of litigation in the federal forum. If we accept this argument, we must dismiss the case at bar in order to permit the Texas judiciary to construe these statutes. *See* Romero v. Coldwell, 455 F.2d 1163 (5th Cir. 1972).

For *Pullman* to require abstention, two elements must be present: (i) the federal litigation must involve unsettled issues of state law; and, (ii) the public policy factors present in *Pullman* must exist in the eminent domain statutes. We conclude that neither fact is present in the instant litigation.

The power of eminent domain in Texas springs from Article I, Section 17 of the Texas Constitution, Vernon's Ann. St. For nearly 130 years the Texas legislature has governed by statute the condemnation process. During this period, literally hundreds of state court opinions have been rendered on various aspects of these statutes. By virtue of this exhaustive litigation, the condemnation

process is clearly defined and the statutory duties and rights well established.

In addition, even if

the state statute in question, although never interpreted by a state tribunal, is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction.

Harman v. Forssenius, 380 U.S. 528, 535, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965). The statutes challenged in *Joiner* come squarely within the scope of *Harman*. The alleged constitutional deficiencies, if found to exist, are subject to cure only by legislative amendment, not by judicial interpretation of existing statutory language. To abstain in order to permit the state judiciary to adjudicate these issues would defeat the primary purpose of abstention—the avoidance of unnecessary litigation. *See* Hobbs v. Thompson, 448 F.2d 456, 463 (5th Cir. 1970).

■ The principal public policy underlying *Pullman* is the desirability of avoiding needless federal-state friction that might arise from federal adjudication of unsettled issues of state law. As we have already suggested, however, interpretation of the state law of condemnation does not generate the potential of such friction. Allegheny County v. Mashuda Co., 360 U.S. 185, 191–192, 79 S. Ct. 1060, 3 L.Ed.2d 1163 (1959). *See also* State v. City of Chattanooga, 264 U.S. 472, 44 S.Ct. 369, 68 L.Ed. 796 (1923); Joslin Mfg. Co. v. Providence, 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167 (1923); Trager v. Peabody Redevelopment Authority, 367 F.Supp. 1000 (D. Mass.1973) (Three-Judge Court). To engineer a *Pullman* abstention the antic-

ipated collision between state and federal sovereigns must be significant, not picayune, and its likelihood must be real, not fanciful. Federal courts are constitutional adjuncts of our system of federalism, and *Pullman* must not be allowed to derail us from fulfilling our adjudicatory duties.

Finally, defendants assert that the Texas eminent domain statutes are analogous to a statewide regulatory scheme of natural resource preservation, the integrity and complexity of which justified abstention in Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L. Ed. 1424 (1942). In the case *sub judice*, however, we are asked to pass upon statutes that are not subject to quick modification of the sort that would effectively eliminate the need for federal review. There is no state policy in issue that may be modified to moot otherwise justiciable issues. Nor is there the threat of confusion by multiple review of the same general issues.

■ Abstention is a formidable doctrine in the federal forum comprised of medusan components that, absent the most meticulous inspection, will transfix and render powerless both litigants and jurists. Its application should be grounded upon fixed principles, strictly applied to the facts of the federal litigation, for an equally formidable doctrine obligates the federal judiciary as much to exercise jurisdiction properly invoked as to dismiss a proceeding where jurisdiction is wanting. Abstention must rest on sound jurisprudential underpinnings; it must not be a label for a visceral aversion to our Article III obligation to adjudicate. Failing to establish that the exercise of jurisdiction by this court would be an abuse of discretion, the abstention arguments asserted by defendants are hereby rejected.[5]

5. As an alternative to abstention, defendants assert the plaintiffs have failed to exhaust existing state remedies, an argument rejected in Hobbs v. Thompson, 448 F.2d 456 (5th Cir. 1971) relying on Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). In Texas, however, the land owner has the right to maintain a collateral attack on the condemnation proceeding. *See, e. g.,* Tonahill v. Gulf States Utilities Co., *supra;* Webb v. Dameron, *supra.* When such a right exists, plaintiffs by establishing federal jurisdiction may proceed in the federal forum without exhaustion of the state court remedy. Allegheny County v. Mashuda Co., *supra.*

### III.

The power of eminent domain is the offspring of political necessity and is inseparable from sovereignty unless denied by fundamental law. Norwood v. Baker, 172 U.S. 269, 277, 19 S.Ct. 187, 43 L.Ed. 443 (1898); Searl v. Lake County School District, 133 U.S. 553, 562, 10 S.Ct. 374, 33 L.Ed. 740 (1890). The "right of the State to authorize the appropriation of every description of property for a public use is one of those inherent powers which belong to state governments, without which they could not well perform their great functions." City of Cincinnati v. Louisville & Nashville RR. Co., 223 U.S. 390, 400, 32 S.Ct. 267, 268, 56 L.Ed. 481 (1912). *See also* Boom Co. v. Patterson, 98 U.S. 403, 25 L.Ed. 206 (1878). This is particularly true in Texas since the Joint Resolution annexing Texas into the Union authorized the retention by Texas of "all the vacant and unappropriated lands lying within its limits . . . ." Joint Resolution approved March 1, 1845, 5 Stat. 797. For an interpretation of that Resolution, *see* United States v. Texas, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950). Wisely, therefore, plaintiffs do not contest the existence of this power of the sovereign. Instead, they launch a multi-front attack on the exercise of that power.

### A. CONSTITUTIONAL BACKDROP

At one time the Constitution imposed no restraints on the exercise of the power of eminent domain.

> This power, denominated the *eminent domain* of the state, is, as its name imports, paramount to all private rights vested under the government, and these last are, by necessary implication, held in subordination to this power, and must yield in every instance to its proper exercise.

The Constitution of the United States, although adopted by the sovereign states of this Union, and proclaimed in its own language to be the supreme law for their government, can, by no rational interpretation, be brought to conflict with this attribute of the states; there is no express delegation of it by the Constitution; and it would imply an incredible fatuity in the states, to ascribe to them the intention to relinquish the power of self-government and self-preservation.

West River Bridge Co. v. Dix, 6 How. (47 U.S.) 507, 531, 12 L.Ed. 535 (1848). With the ratification of the Fourteenth Amendment, the sovereign power of eminent domain became subject to constitutional restrictions. *See* Chicago, Burlington & Quincy R.R. Co. v. Chicago, 166 U.S. 226, 232–241, 17 S.Ct. 581, 41 L.Ed. 979 (1897). A brief summary of these restrictions must necessarily preface our analysis of the Texas statutes.

That the power of eminent domain must be exercised in accordance with due process of law is an explicit requirement under the Fourteenth Amendment. The perimeters of the Due Process requirement in eminent domain proceedings have been sharply defined through a series of Supreme Court decisions, however, and the customary "due process" attack has limited chance of success. For example, the Court has repeatedly characterized the condemnor's decision on the necessity for a taking and the quantity to be appropriated as legislative and has, therefor, denied to land-owners the right to participate in that decision-making process or to litigate on federal constitutional grounds the decision to condemn private property.[6] The constitutional issue set-

---

6. *See* United States v. Welch, 327 U.S. 546, 557, 66 S.Ct. 715, 90 L.Ed. 843 (1946) (Reed, J., concurring); North Laramie Land Co. v. Hoffman, 268 U.S. 276, 284, 45 S.Ct. 491, 69 L.Ed. 953 (1925); State v. City of Chattanooga, 264 U.S. 472, 483, 44 S.Ct. 369, 68 L.Ed. 796 (1924); Rindge Co. v. County of Los Angeles, 262 U.S. 700, 708, 43 S.Ct. 689, 67 L.Ed. 1186 (1923); Joslin Co. v. Providence, 262 U.S. 668, 678, 43 S.Ct. 684, 67 L.Ed. 1167 (1923); Bragg v. Weaver, 251 U.S. 57, 58, 40 S.Ct. 62, 64 L.Ed. 135 (1919); Sears v. City of Akron, 246 U.S. 242, 251, 38 S.Ct. 245, 62 L.Ed. 688

tled by these cases is succinctly stated in Joslin Co. v. Providence, 262 U.S. 668, 678–679, 43 S.Ct. 684, 688, 67 L.Ed. 1167 (1923), in which the Court affirmed the constitutionality of the Rhode Island condemnation statutes:

> Finally, the validity of the act is challenged as denying due process of law, on the ground that the question of the necessity for the taking of the property has not been determined by the Legislature itself, but is relegated to the city to decide *ex parte,* without appeal or opportunity for hearing and decision by an impartial tribunal. That the necessity and expediency of taking property for public use is a legislative and not a judicial question is not open to discussion. (Citations Omitted). Neither is it any longer open to question in this court that the Legislature may confer upon a municipality the authority to determine such necessity for itself. (Citations Omitted).
>
> The question is purely political, does not require a hearing, and is not the subject of judicial inquiry.

On the other hand, with respect to the compensation to be paid for the appropriation of private property, due process requires that the property owner be given an opportunity to be heard and reasonable notice of the proceedings.[7] And when there is a right to a hearing, one constitutional method of finding damages arising from the condemnation of private property is to have an assessment by appointed commissioners, subject to an appeal to a court carrying with it the right to have the matter determined upon a full trial.[8] Finally, as to the act of appropriation,

> (i)t has long been settled that the taking of property for public use by a state or one of its municipalities need not be accompanied or preceded by payment, but that the requirement of just compensation is satisfied when the public faith and credit are pledged to a reasonably prompt ascertainment and payment, and there is adequate provision for enforcing the pledge.

Joslin Co. v. Providence, 262 U.S. 668, 677, 43 S.Ct. 684, 688, 67 L.Ed. 1167 (1923).[9]

The Supreme Court has similarly narrowed the scope and application of the Equal Protection Clause as it applies to state law of eminent domain. Regard-

(1918); United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 65, 33 S.Ct. 667, 57 L.Ed. 1063 (1913); Adirondack Ry. Co. v. New York, 176 U.S. 335, 349, 20 S.Ct. 460, 44 L.Ed. 492 (1900); Backus v. Fort Street Union Depot Co., 169 U.S. 557, 568, 18 S.Ct. 445, 42 L.Ed. 853 (1898); United States v. Gettysburg Elect. Ry. Co., 160 U.S. 668, 685, 16 S.Ct. 427, 40 L.Ed. 576 (1896); Sweet v. Rechel, 159 U.S. 380, 393–395, 16 S.Ct. 43, 40 L.Ed. 188 (1895); Shoemaker v. United States, 147 U.S. 282, 298, 13 S.Ct. 361, 37 L.Ed. 170 (1893); Boom Co. v. Patterson, 98 U.S. 403, 406, 25 L.Ed. 206 (1878).

7. Bailey v. Anderson, 326 U.S. 203, 205, 66 S.Ct. 66, 90 L.Ed. 3 (1945); North Laramie Land Co. v. Hoffman, 268 U.S. 276, 285, 45 S.Ct. 491, 69 L.Ed. 953 (1925); State v. City of Chattanooga, 264 U.S. 472, 483, 44 S.Ct. 369, 68 L.Ed. 796 (1923); Bragg v. Weaver, 251 U.S. 57, 59, 40 S.Ct. 62, 64 L. Ed. 135 (1919); Huling v. Kaw Valley Ry., 130 U.S. 559, 563, 9 S.Ct. 603, 32 L.Ed. 1045 (1889); Lent v. Tillson, 140 U.S. 316, 327, 11 S.Ct. 825, 35 L.Ed. 419 (1891); Hagar v. Reclamation Dist., 111 U.S. 701, 708, 4 S. Ct. 663, 28 L.Ed. 569 (1884).

8. Bailey v. Anderson, 326 U.S. 203, 205, 66 S.Ct. 66, 90 L.Ed. 3 (1945); North Laramie Land Co. v. Hoffman, 268 U.S. 276, 284–285, 45 S.Ct. 491, 69 L.Ed. 953 (1925); Bragg v. Weaver, 251 U.S 57, 59, 4 S.Ct. 663, 28 L. Ed. 569 (1919); Backus v. Fort Street Union Depot Co., 169 U.S. 557, 569, 18 S.Ct. 445, 42 L.Ed. 853 (1898); Pearson v. Yewdall, 95 U.S. 294, 296, 24 L.Ed. 436 (1877).

9. *Accord,* Hays v. Port of Seattle, 251 U.S. 233, 238, 40 S.Ct. 125, 64 L.Ed. 243 (1920); Bragg v. Weaver, 251 U.S. 57, 62, 4 S.Ct. 663, 28 L.Ed. 569 (1919); Crozier v. Krupp, 224 U.S. 290, 306, 32 S.Ct. 488, 56 L.Ed. 771 (1912); Williams v. Parker, 188 U.S. 491, 502–503, 23 S.Ct. 440, 47 L.Ed. 559 (1903); Adirondack Ry. Co. v. New York, 176 U.S. 335, 349, 20 S.Ct. 460, 44 L.Ed. 492 (1900); Backus v. Fort Street Union Depot Co., 169 U.S. 557, 568, 18 S.Ct. 445, 42 L.Ed. 853 (1898); Sweet v. Rechel, 159 U.S. 380, 400, 404, 407, 16 S.Ct. 43, 40 L.Ed. 188 (1895) and cases cited.

ing the delegation of authority to commence condemnation proceedings, the Court said:

> The legislature may authorize a municipal corporation to take, for public use, at the outset, the absolute title to specific private property, if either the statute under which that is done, or a general statute, recognizes the absolute right of the owner, upon his property being taken, to just or reasonable compensation therefor, and makes provision, in the event of the disagreement of the parties, for the ascertainment, by suit, without unreasonable delay or risk to the owner, of the compensation to which under the constitution he is entitled . . . .

Sweet v. Rechel, 159 U.S. 380, 404, 16 S.Ct. 43, 50, 40 L.Ed. 188 (1895).[10] Other equal protection challenges have established the right of the state to create multiple classes of property subject to appropriation by condemnation [11] and to establish varying compensation standards [12] so long as the compensation ultimately awarded is reasonable and just.[13]

While the basic principles summarized above may certainly be discussed in greater detail, they constitute the funda-mental restrictions imposed upon a state's exercise of its sovereign right of eminent domain. Moreover, the cases cited are illustrative of a well-established body of constitutional law against which the Texas statutes must be tested.

## B. THE TEXAS SCHEME

The power to appropriate private property is a power originally reserved to the State of Texas by Article I, Section 14 of the Texas Constitution of 1845. Adopted practically verbatim in succeeding constitutions and currently enshrined as Article I, Section 17, the power of eminent domain has only two prerequisites: (i) the appropriation must be for a public purpose; and (ii) adequate compensation must be given or secured before private property may be seized. The Texas legislature has enacted a statutory procedural system governing all appropriations of private property under the power of eminent domain, Vernon's Tex.Rev.Civ.Stat.Ann. arts. 3264–3271.

This procedure is substantially the same as that utilized by other states, elements of which have previously been adjudicated constitutional by the Supreme Court.[14]

---

10. *See also* Rindge Co. v. County of Los Angeles, 262 U.S. 700, 43 S.Ct. 689, 67 L.Ed. 1186 (1923); Joslin Co. v. Providence, 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167 (1923); Sears v. City of Akron, 246 U.S. 242, 251, 38 S.Ct. 245, 62 L.Ed. 688 (1918); Long Island Water Supply Co. v. Brooklyn, 166 U.S. 685, 17 S.Ct. 718, 41 L.Ed. 1165 (1897).

11. *See, e. g.,* Dohany v. Rogers, 281 U.S. 362, 50 S.Ct. 299, 74 L.Ed. 904 (1930).

12. *See, e. g.,* Dohany v. Rogers, 281 U.S. 362, 50 S.Ct. 299, 74 L.Ed. 904 (1930); McCoy v. Union Elev. R. Co., 247 U.S. 354, 38 S.Ct. 504, 62 L.Ed. 1156 (1917); Marchant v. Pennsylvania Co., 153 U.S. 380, 14 S.Ct. 894, 38 L.Ed. 751 (1894).

13. Joslin Co. v. Providence, 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167 (1923); Bragg v. Weaver, 251 U.S. 57, 4 S.Ct. 663, 28 L.Ed. 569 (1919); Backus v. Fort Street Union Depot Co., 169 U.S. 557, 18 S.Ct. 445, 42 L.Ed. 853 (1898).

14. *See* Rindge Co. v. County of Los Angeles, 262 U.S. 700, 43 S.Ct. 689, 67 L.Ed. 1186 (1923) (Cal.); Lent v. Tillson, 140 U.S. 316, 11 S.Ct. 825, 35 L.Ed. 419 (1891) (Cal.); Huling v. Kaw Valley Ry., 130 U.S. 559, 9 S.Ct. 603, 32 L.Ed. 1045 (1889) (Kansas); Davidson v. New Orleans, 96 U.S. 97, 24 L.Ed. 616 (1877) (Louisiana); Williams v. Parker, 188 U.S. 491, 23 S.Ct. 440, 47 L.Ed. 559 (1903) (Mass.); Sweet v. Rechel, 159 U.S. 380, 16 S.Ct. 43, 40 L.Ed. 188 (1895) (Mass.); Backus v. Fort Street Union Depot Co., 169 U.S. 557, 18 S.Ct. 445, 42 L.Ed. 853 (1898) (Michigan); Dohany v. Rogers, 281 U.S. 362, 50 S.Ct. 299, 74 L.Ed. 904 (1930) (Michigan); Boom Co. v. Patterson, 98 U.S. 403, 25 L.Ed. 206 (1878) (Minn.); Adirondack Co. v. New York, 176 U.S. 335, 20 S.Ct. 460, 44 L.Ed. 492 (1900) (New York); Sears v. City of Akron, 246 U.S. 242, 38 S.Ct. 245, 62 L.Ed. 688 (1918) (Ohio); Joslin Co. v. Providence, 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167 (1923) (Rhode Island); State v. City of Chattanooga, 264 U.S. 472, 44 S.Ct. 369, 68 L.Ed. 796

The failure of the condemnor and the property owner to agree on a negotiated sales price gives the condemnor the right to file in a County Court at Law a Statement in Condemnation containing a description of the property to be condemned, the name of the owner, and the purpose for which the condemnation is being sought. When such a statement is filed, the county judge appoints three Special Commissioners in Condemnation to assess damages. After serving written notice to the property owner and the condemnor, the Commissioners conduct a hearing, permitting both parties to submit evidence on the damage issue. If either party is dissatisfied with the decision of the Commissioners, written objections may be filed in the County Court at Law within twenty days of the filing of that decision with the county judge. These objections serve as an appeal from the decision of the Special Commissioners and trigger trial *de novo* in the County Court at Law. During the pendency of that litigation, the condemnor may enter upon and take possession of the property subject to payment to the property owner or into the registry of the court of an amount equal to the award of the Special Commissioners. The judgment rendered in the County Court at Law is subject to appellate review just as any other civil action.

Although plaintiffs contend that the entire "code" governing eminent domain proceedings is unconstitutional, we may pretermit discussion of those statutes which plaintiffs are patently without standing to challenge, to wit:

(a) Article 3264a, granting the power of eminent domain to county governments;

(b) Article 3264b, which was repealed by the Texas legislature in 1971;

(c) Article 3264c, granting the power of eminent domain to the Commission of Control for Texas Centennial Celebrations;

(d) Article 3264d, granting the power of eminent domain to the Board of Regents of the ·Texas State College for Women of Texas; and,

(e) Article 3266a, modifying the jurisdiction of the district courts and county courts at law in contested eminent domain litigation.

Allowing the greatest latitude to plaintiffs' claims, we cannot identify any nexus between these plaintiffs and these statutes that might create a zone of interest sufficient to permit them to challenge the constitutionality of the statutes. Neither the County of Dallas, the Commission of Control for Texas Centennial Celebrations, or the Board of Regents has threatened to initiate or initiated any eminent domain proceeding against property owned by these plaintiffs. Nor do these litigants assert in any pleading that the modification in Article 3266a of the jurisdiction of the district and county courts at law has affected them or their litigation.

As to the remaining statutes, plaintiffs urge thirteen constitutional deficiencies in their Amended Complaint and another three in their trial brief.[15]

(1924) (Tenn.) ; Bailey v. Anderson, 326 U.S. 203, 66 S.Ct. 66, 90 L.Ed. 3 (1945) (Virginia) ; Bragg v. Weaver, 251 U.S. 57, 4 S.Ct. 663, 28 L.Ed. 569 (1919) (Virginia) ; and North Laramie Land Co. v. Hoffman, 268 U.S. 276, 45 S.Ct. 491, 69 L.Ed. 953 (1925) (Wyoming).

15. In particular, plaintiffs assert the statutes are unconstitutional because they "cumulatively and alternatively :"

(1) Fail to require that any procedural or substantive standards be followed by the condemnor in making the determination to take private property ;

(2) Fail to require that actual notice be given to the affected property owners prior to the time that the condemnor decides to condemn private property ;

(3) Fail to require or to allow affected property owners to participate in hearings to determine the necessity for, the public purpose of, the scope of, and the timing of, the determinations adopted by the condemnor to forceably take private property ;

(4) Fail to require that meetings concerned with the determination of taking be preceded by reasonable public notice and be open to the affected property owners ;

For purposes of this opinion we summarize the alleged deficiencies as "failures" in (1) the decision-making process whereby a potential condemnor deems it necessary to exercise that power; (2) the condemnation procedures that precede a final adjudication of the propriety and cost of appropriation; (3) the compensation standards; and (4) the statutory protections granted land owners in the event that the condemnor abandons the project, terminates the condemnation proceeding, or has wrongfully seized the property.

A threshold issue is the perspective from which the statutes will be viewed. Admitting that the statutes form part of the general law of Texas, plaintiffs' counsel nonetheless contends that "statutes are determined to be constitutional or nor by what is within the four corners of a statute." We are unwilling to don the blinders offered by plaintiffs' able counsel.

 Absent explicit legislative intent, a statute or series of statutes comprising a general system of conduct will not be construed in a vacuum. The standard has long been that all laws on the same subject or in *pari materia* are to be read together. *See* The Amelia, 1 Cranch (5 U.S.) 1, 2 L.Ed. 15 (1801); Alexander v. Alexandria, 5 Cranch (9 U.S.) 1, 3 L.Ed. 19 (1809); Polk v.

(5) Fail to require that planning studies be made to support the determination of the taking, and necessity thereof;

(6) Fail to require that all or major steps in the decision making process of the condemnor leading up to the decision to take private property be a matter of public record accessible to affected property owners; the statutes, in fact, permit the decision making process to be entirely secret;

(7) Fail to prohibit to condemnor from delegating the decision to take private property to private committees, bodies, persons, or non-profit corporations (such as the State Fair of Texas);

(8) Permit the condemnor to initiate condemnation without having determined a fixed, purposeful, public use for the properties involved, and, in fact, permit the condemnor to change the intended use at its whim after the condemnation process has begun;

(9) Fail to require or provide that affected property owners shall have full right to judicial review of the condemnor's determination as to the necessity for, the extent of, and the public purpose of, the taking of private property;

(10) Fail to authorize (in the condemnation process) any State judicial review of the propriety of the taking or the amount of compensation to be paid until after the condemnor has the statutory right to evict;

(11) Permit the County Court Judge who appoints the Special Commissioners (who determine value in the administrative process) also to be the Judge before whom all appeals from Commissioners' awards must be filed and determined;

(12) Fail to require, in urban areas where housing is limited, that compensation be determined in an amount that is, as a minimum, sufficient to enable displaced homeowners to acquire substantially similar housing in similar neighborhoods;

(13) Require that damages caused by the taking be "the market value of the property in the market where it is located at the time of the hearing" before the Commissioners, thus precluding award of additional damages upon proof that the condemnor artificially depressed the market value prior to the taking;

(14) Fail to preclude, and thus allow, administrative transfer of title to the condemnor on the official tax records, plats and other deed records at the time the condemnor deposits money assessed by Commissioners into the registry of the County Court, without the necessity of a prior judicial proceeding;

(15) Fail to require that the condemnor be bound by Jury verdict in the State Court proceeding, but allow the condemnor to take voluntary nonsuit, without compensating the condemnee for all personal expenses and obligations incurred as a direct result of the condemnation; and,

(16) Where the condemnor takes temporary possession prior to final adjudication and thereafter abandons the condemnation, makes the condemnor liable to the property owner for damages only to the extent of the money deposited in the registry of the County Court; although the amount deposited may be insufficient to restore the land and residences destroyed by the condemnor, no Texas State Court has the power to render an enforceable judgment for such additional damages in the condemnation process.

Wendal, 9 Cranch (13 U.S.) 87, 3 L.Ed. 665 (1815). Therefore, sections of a State constitution will affect the interpretation of a related statute. *See* Cooper Mfg. Co. v. Ferguson, 113 U.S. 727, 733, 5 S.Ct. 739, 28 L.Ed. 1137 (1885). Although each statute is "individual" and presents its own problem areas, G. S. Nicholas & Co. v. United States, 249 U.S. 34, 39 S.Ct. 218, 63 L. Ed. 461 (1919), plaintiffs cannot associate selected statutes for the purpose of launching a constitutional attack while at the same time disassociating pertinent, related statutes that create rights and remedies relevant to the subject of litigation.

■■■ *1. Decision to Condemn.*—Focusing now upon the eminent domain statutes, plaintiffs first attack the absence of certain procedural requirements accompanying the process by which the condemnor makes the decision that appropriation of private property is necessary. Plaintiffs argue, *inter alia*, that condemnors should be required to give actual notice to property owners that their property might become the subject of condemnation proceedings, to conduct public hearings on the issue of condemnation, to conduct planning studies, and to record their proceedings for public examination and review.[16]

The simple answer to plaintiffs' argument lies in the well-settled body of case law that we have previously discussed.[17]

Together these decisions instruct us that because the condemning authority's decision regarding the need for a taking and the property to be taken is fundamentally legislative, landowners have no right to participate in that decision or to litigate the decision to condemn on federal constitutional grounds. And absent any constitutional right to participate or intervene, we are unwilling and unable to find constitutional canonization for the other procedural safeguards proposed by plaintiffs.

Many of the arguments in favor of intervention were expressly rejected in Sears v. City of Akron, 246 U.S. 242, 38 S.Ct. 245, 62 L.Ed. 688 (1918). Based on a project report by a private corporation, the City of Akron announced its intention to appropriate by condemnation all waters above a point fixed on the Cuyahoga River and its tributaries in order to guarantee its citizens a permanent water supply. A local property owner attacked the constitutionality of the state statute granting the power of eminent domain to the City, asserting *inter alia* that affected property owners were excluded from the decision-making process. In rejecting this argument the Court stated:

> Plaintiff contends that the ordinance is void because the general statute which authorized the appropriation violates . . . the Fourteenth Amendment, in that it authorizes the

---

16. We note that some of the alleged defects detected by plaintiffs might be cured by the Texas Open Meetings Act, Vernon's Tex. Rev.Civ.Stat.Ann. art. 6252–17 (Supp.1974), which, since it became effective in 1967, has guaranteed to all persons access to the deliberations of any governmental body "at which any public business or public policy . . . is discussed. . . ." Because the Texas Constitution permits condemnation only for a public purpose, at least some of the deliberations regarding the need to initiate eminent domain proceedings, the quantity of property to be taken, and the merit of alternative projects would appear to be covered by the Statute, and thus subject to the procedural protections provided.

On the other hand, the Act specifically provides that

> "[t]he public may be excluded from that portion of a meeting during which a discussion is had with respect to the purchase, exchange, lease, or value of real property . . . when such discussion would have a detrimental effect on the negotiative portion of the governmental body as between such body and a third person, firm or corporation."

Vernon's Tex.Rev.Civ.Stat.Ann. art. 6252–17(2)(f) (1974 Supp.).

Since we conclude that the procedural safeguards urged by plaintiffs are not mandated by the United States Constitution, the scope of their potential availability under the Open Meetings Act cannot affect the basic constitutional argument here considered.

17. *See* Part III A *supra*.

municipality to determine the necessity for the taking of private property without the owners having an opportunity to be heard as to such necessity; that in fact no necessity existed for any taking which would interfere with the company's project, since the city might have taken water from the Little Cuyahoga . . . ; and furthermore that it has taken ten times as much water as it can legitimately use. It is well settled that while the question whether the purpose of a taking is a public one is judicial, (Citations omitted); the necessity and the proper extent of a taking is a legislative question.

246 U.S. at 251, 38 S.Ct. at 248.

In North Laramie Land Co. v. Hoffman, 268 U.S. 276, 45 S.Ct. 491, 69 L. Ed. 953 (1925), the Court rejected plaintiff's due process challenge based upon his inability to participate in the discussions before the County Commissioners on the need for a proposed road.

> There remains for consideration the plaintiff's objection . . . that plaintiff was afforded no opportunity for a hearing before either the appraisers or the Board of County Commissioners with respect either to the location of the road or the damage suffered by plaintiff by the opening of the road. The taking of property provided for by the statute is a taking of land under the direction of public officers for a public use. As was held in Bragg v. Weaver, *supra*, the necessity and expediency of the taking of property for public use "are legislative questions, no matter who may be charged with their decision, and a hearing thereon is not essential to due process in the sense of the Fourteenth Amendment." (Citations omitted)

268 U.S. at 284, 45 S.Ct. at 494.

Attempting to circumvent the irrecusable holding of these cases, plaintiffs assert that the City of Dallas in fact acted administratively, not legislatively, and that accordingly the Due Process Clause guaranteed the owners the right to participate in the decision-making process. They note that the decision to initiate eminent domain proceedings to acquire the property owned by the plaintiffs was made by resolution, which under Texas law is considered to be an administrative rather than a legislative act. They remind us that Erie R. R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, obliges us to honor this state classification.

That the City Council initiated the challenged condemnation proceedings by resolution is not disputed. In support of the argument that action by resolution is administrative, plaintiffs cite Wilder v. American Produce Co., 147 S. W.2d 936, 938 (Tex.Civ.App.—1940), rev'd on other grounds, 138 Tex. 519, 160 S.W.2d 519 (1942); City of San Antonio v. Micklejohn; 89 Tex. 79, 33 S.W. 735 (1895). As a general statement of Texas law plaintiffs' contention as to the character of a municipal resolution is correct, but we reject this label insofar as it relates to a decision to appropriate property through condemnation.

■ An ordinance is always a legislative act since it is the method whereby a municipality enacts laws. Tex.Rev.Civ.Stat.Ann. arts. 962, 968, 996, 1011, 1145. In contrast, a resolution is not law, but only an opinion, governing the City's procedure and operation within the limits of its constitution or charter. City of San Antonio v. Micklejohn, 89 Tex. 79, 33 S.W. 735, 736 (1895). A resolution is accordingly subordinate to an ordinance. Brand v. City of San Antonio, 37 S.W. 340 (Tex.Civ. App.1896). Moreover, when a city's charter or a state statute require proposed actions to be approved by an ordinance, a resolution may not be passed as an alternative. *See, e. g.,* Southwestern Bell Tel. Co. v. Gohmert, 222 S.W.2d 644 (Tex.Civ.App.—1949); Mills v. City of San Antonio, 65 S.W. 1121 (Tex.Civ. App.—1901, writ ref'd.).

■ Because resolutions generally deal with ministerial functions relating to a city's procedure and operation, they are termed "administrative in char-

acter." Wilder v. American Produce Co., 147 S.W.2d 936, 938 (Tex.Civ.App. 1940), rev'd on other grounds, 138 Tex. 519, 160 S.W.2d 519 (1942). The decision to appropriate private property is not, however, a minor ministerial function. The power of eminent domain, whether exercised by the state legislature or a municipal corporation, is a unique sovereign right fundamental to the performance of governmental responsibilities. This power is essentially and fundamentally legislative, and its character cannot be changed by switching the labels under which it is pursued. As stated by the Supreme Court in a challenge to the condemnation of property for a sea coast highway:

> And so construed this statute is not in conflict with the Fourteenth Amendment, either because it fails to provide for a hearing by the landowners before such resolution is adopted, or otherwise. The necessity for appropriating private property for public use is not a judicial question. This power resides in the Legislature, and may either be exercised by the Legislature or delegated by it to public officers.

"Where the intended use is public, the necessity and expediency of the taking may be determined by such agency and in such mode as the State may designate. They are legislative questions, no matter who may be charged with their decision . . . ." (Citation omitted)

Rindge Co. v. County of Los Angeles, 262 U.S. 700, 709, 43 S.Ct. 689, 693, 67 L.Ed. 1186 (1923). Accord Sears v. City of Akron, 246 U.S. 242, 251, 38 S. Ct. 245, 62 L.Ed. 688 (1918).[18]

2. *Pre-Judgment Possession.* Plaintiffs next challenge the litigation procedures that precede a final adjudication of the propriety and cost of an appropriation of private property. The gravamen of their complaint on this point is that potential condemnors may acquire the right to possession through Article 3268 prior to an adjudication of the right of condemnation, the necessity for condemnation, or the amount of compensation to be paid. We are unable to find a constitutional defect in this portion of the eminent domain framework.

Initially, we note that both the Texas Constitution and the Fourteenth Amend-

---

18. Assuming *arguendo* that form governs substance such that a municipal resolution is, for purposes of the Fourteenth Amendment, an administrative act, plaintiffs are still not entitled to relief. Not every administrative act gives rise to a constitutional right of participation under the Due Process Clause. Traditionally due process requires an affected individual be given the right of participation, whether by a hearing or otherwise, only when the administrative act complained of directly affects a zone of interest protected by the constitution. See Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (employment contract); Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (employment contract); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (driver's license); and Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare benefits). When participation is required, the degree of participation varies with the nature of the right. See Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

The *decision* to seek condemnation of private property does not per se encroach upon any interest, constitutional or otherwise, of property owners, for there exists subsequent to that decision an opportunity for full and fair judicial review of both the constitutionality of the taking and the compensation to be paid. This intervening judicial process precludes the necessity under the Fourteenth Amendment for participation by the property owner in the decision-making process.

In the alternative, assuming that a resolution is an administrative act entitling property owners to a right of participation in the decision-making process, there is no issue properly before this three-judge court. Since both the Fourteenth Amendment and the State statutes are silent on how to begin the decision-making process, it is possible for the municipality to determine the necessity for condemnation by ordinance—a legislative act that carries no right of participation. Thus, the decision to act administratively and deny to property owners their "right" of participation would not affect the basic constitutionality of the State statutes but might give rise to a cause of action under the Civil Rights Act.

ment require that condemnation be for a public purpose and that just compensation be paid to the property owner. Any owner who believes that the condemnor is without authority to initiate condemnation proceedings or that there is no public purpose for the condemnation has two avenues of judicial review. First, by including these issues in the written objections filed in response to the Report of the Special Commissioners in Condemnation, the property owner may litigate these matters in the County Court at Law with the right of appellate review of any final judgment. Pursuit of this avenue of review does pose the risk that the condemnor will gain the right of possession through Article 3268.

As an alternative, however, property owners may commence a simultaneous collateral injunctive action in district court. If the proposed appropriation is not for a public purpose or the condemnor does not have the power to condemn property, the condemnation proceedings are void, the County Court at Law is without jurisdiction, and the district court will enjoin the condemnation proceedings. Contrary to plaintiffs' contentions at oral argument, the burden is upon the condemnor to establish the validity of the proceedings in the County Court at Law. *See* Dallas v. Atkins, 110 Tex. 627, 223 S.W. 170 (1920); Crawford v. Frio County, 153 S.W. 388 (Tex. Civ.App.—1913), no writ. We believe that the ability of the property owners to receive a judicial adjudication of the right to condemn private property through a collateral proceeding sufficiently protects their interest in the property sought to be condemned.

Although plaintiffs contend it is "unconstitutional" to place the burden on property owners to request judicial review of the propriety of condemnation, they fail to substantiate this allegation with pertinent case law. In our opinion, to permit property owners to receive a prompt adjudication of the propriety of condemnation with the condemnor bearing the burden of proof and persuasion is compatible with the Due Process Clause of the Fourteenth Amendment. The minimal burden incurred in commencing a second law suit is no greater a burden than a property owner would otherwise incur in litigating this issue in the County Court at Law. Moreover, under Articles 3269 and 3266a, if a collateral action is commenced in district court, the district court may determine all matters in dispute among the parties, including condemnation of the property, assessment of damages, and any other issues raised in the objections filed to the Report of the Special Commissioners in Condemnation. By this procedure, therefore, property owners receive the relief they request—judicial review of the propriety of condemnation before a loss of the right of possession under Article 3268.

Plaintiffs insist that the power granted by Article 3268 to enter upon and take possession of property prior to an adjudication of the right of condemnation and the amount of compensation to be paid violates "modern" standards of due process developed through Mitchell v. W. T. Grant Co., 416 U.S. 600, 94 S. Ct. 1895, 40 L.Ed.2d 406 (1974); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972); and Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). It is an interesting argument, but it does not persuade us.

> It is now firmly established that
>
> the legislature may authorize a municipal corporation to take, for public use, at the outset, the absolute title to specific private property, if either the statute under which that is done, or a general statute, recognizes the absolute right of the owner, upon his property being taken, to just or reasonable compensation therefor, and makes provision, in the event of the disagreement of the parties, for the ascertainment, by suit, without unreasonable delay or risk to the owner, of the compensation to which under the constitution he is entitled . . . .

Sweet v. Rechel, 159 U.S. 380, 404, 16 S.Ct. 43, 50, 40 L.Ed. 188 (1895). *See also* Rindge Co. v. County of Los Angeles, 262 U.S. 700, 43 S.Ct. 689, 67 L.Ed. 1186 (1923); Joslin Co. v. Providence, 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167 (1923); Sears v. City of Akron, 246 U.S. 242, 251, 38 S.Ct. 245, 62 L.Ed. 688 (1918); Long Island Water Supply Co. v. Brooklyn, 166 U.S. 685, 17 S.Ct. 718, 41 L.Ed. 1165 (1897). Because the statutory eminent domain procedures in Texas come squarely within the constitutional perimeters established by *Sweet* and its progeny, the basic issue is whether this court possesses the power to ignore, and thereby in effect to overrule, the explicit mandates of the Supreme Court.

 Characterizing *Sweet* as merely the remnant of a superceded due process standard, plaintiffs implicitly assert the doctrine of stare decisis to be a "principle of policy," not a rigid mechanical formula, *see* Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), thereby allowing this court *in its discretion* to reject the well established principles of constitutional law affecting the power of eminent domain. We believe, however, that plaintiffs have failed to comprehend the constitutional restrictions imposed on this forum. While the Supreme Court may view conformity with its previous decisions as a matter of stare decisis, *see* Moragne v. States Marine Lines, 398 U.S. 375, 403, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), the federal district court *must* adhere to the constitutional interpretations by the Supreme Court as a matter of law by virtue of the Supremacy Clause.

Article VI of the Constitution makes the Constitution the "supreme Law of the Land." In 1803, Chief Justice Marshall, speaking for a unanimous Court, referring to the Constitution as "the fundamental and paramount law of the nation," declared in the notable case of Marbury v. Madison, (Citation omitted), that "It is emphatically the province and duty of the judicial department to say what the law is." This decision declared the basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system.

Cooper v. Aaron, 358 U.S. 1, 18, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958). *See also* Bush v. Orleans Parish School Board, 188 F.Supp. 916, 924–925 (E.D. La.1960), aff'd, 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806 (1961).

It may well be that the minimum standards of due process approved as constitutional in earlier eminent domain cases is no longer adequate to protect property owners. Perhaps the time has come for the Court to overrule Bragg v. Weaver, 251 U.S. 57, 40 S.Ct. 62, 64 L.Ed. 135 (1919); Sweet v. Rechel, 159 U.S. 380, 16 S.Ct. 43, 40 L.Ed. 188 (1895) and the numerous other cases we have cited.[19] It is, however, beyond the power of this court to refuse the clear mandates of the Supreme Court.

Although it is unnecessary to our decision, we feel compelled to note that in our opinion plaintiffs have failed to establish that the amount of process constitutionally due in eminent domain procedures has changed since *Bragg, Sweet* and their related cases. We do not believe that the due process standards evolving from *Sniadach, Lynch, Fuentes* and *Mitchell* are applicable to the condemnation of property under the doctrine of eminent domain. In the first place, the methods of appropriation in the creditors' rights cases and the eminent domain cases have different origins. The alleged right of possession by a creditor arises from a private contractual relationship, which the judiciary is requested to enforce. This debtor-creditor relationship and the underlying con-

19. *See* notes 6 through 9 and 14, *supra.*

tract frequently arise through unequal bargaining powers and create thereby the potential for abuse of the judicial process by the creditor. In contrast, the power of eminent domain is a sovereign right that may be exercised by the State in its discretion for any public purpose; it is not contingent upon prior approval by potentially affected property owners.

As to the nature of the power of appropriation, the contract between the debtor and creditor establishes the responsibilities and privileges of each party. In enforcing that contract, the judiciary must be cognizant of recognizing contractual powers in the creditor that are, under traditional equity concepts, unconscionable. The power of eminent domain, however, does not require a balancing of interests, for the power has only two restrictions: that the condemnation be for a public purpose and that just compensation be paid. It is not necessary, therefore, to initiate an inquiry into the process whereby the power of appropriation originated. One further distinction involves the nature of the parties. Clearly the creditor seeking possession is an interested party having a selfish interest in the outcome of the litigation. In contrast, the State pursues condemnation on behalf of the general public and is a totally disinterested party to the proceedings.[20]

■ As to the purpose of the appropriation, the creditor seeks possession of the property in order to protect his economic investment and preserve the property from destruction, removal to another state, or concealment. Condemnation, however, is for the general public—a criteria easily tested in the district court before a loss of possession—and does not require a balancing of the relative interests of the parties.

For these reasons, we believe the power of eminent domain to be unique and distinct from any alleged right of possession arising from debtor-creditor relationships and decline to apply the due process standard created by *Sniadach* and its progeny to this sovereign power.[21]

■ 3. *Compensation.* Plaintiffs' third series of objections relate to the compensation standards in Texas,[22] which are established by Tex.Rev.Civ. Stat.Ann. arts 3265 and 3266b. Basically, the

20. In the case at bar, the condemnor is a municipal corporation explicitly delegated the power of eminent domain by the legislature under Article 6081e. We do not have an allegation that the power of eminent domain has been delegated to a private corporation which has an interest in the condemnation proceeding.

21. Assuming the due process standard has changed, we believe the protections established by the Texas eminent domain statutes comply with the requirements of Mitchell v. W. T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). The right to possession under Article 3268 arises only after the potential condemnor has filed a detailed Statement in Condemnation specifically detailing the property sought to be condemned, the alleged public purpose, and the name and address of the property owner. The various protections identified in *Mitchell* exist in the Texas scheme, including the guarantee by the State of indemnification in the event the condemnation proceeding is wrongfully initiated.

Of course, we do see one distinction. In *Mitchell*, the writ of sequestration was is-

sued by a judge who personally examined the pleadings, the affidavits, and related documents. While the right to possession under Article 3268 does not require the condemnor to appear before a judge, judicial review by the County Judge of the Statement in Condemnation has occurred prior to the appointment of the Special Commissioners in Condemnation. Moreover, the property owner may receive a prompt adjudication of the right of the potential condemnor to invoke the power of condemnation through the collateral injunctive suit in district court.

22. Plaintiffs also allege that it offends due process to permit the County Judge who appoints the Special Commissioners in Condemnation to be the judge who conducts the trial on the objections to the Special Commissioners' Report. Although we certainly recognize the right of every litigant to an unbiased forum in which to litigate his grievances, plaintiffs have failed to establish that the protections created by Article V, Section 11 of the Texas Constitution and Article 15, Tex.Rev.Civ.Stat.Ann., are not adequate to insure this right.

compensation for land taken by eminent domain is measured by the market value of the land at the time of the taking. This is the date upon which the condemnor lawfully takes actual possession or . . . takes constructively by a deposit of the special commissioners' award.

City of Fort Worth v. Corbin, 504 S.W. 2d 828, 830 (Tex.1974). If only a portion of the tract is condemned, the Special Commissioners may take into consideration the increase or decrease in value of the remaining parcel by virtue of the condemnation. The property owner is not entitled to compensation for injuries (or benefits) that he sustains in common with the general community. In addition to an award based on the market value of the property, the property owner who is actually displaced is entitled to reasonable moving expenses not to exceed $500 if the property is a private residence or $5,000 if the property is a place of business. The legislature has authorized participation by the State and its political subdivisions in the Federal Uniform Relocation Assistance and Real Property Acquisition Policies Program. By such participation, the condemnor may pay to displaced property owners supplemental benefits to permit them to acquire replacement housing, rental supplements, and additional compensation for any expenses incurred in the transfer of the property to the condemnor.

In *Corbin*, the Supreme Court of Texas recently summarized what may be taken into consideration in ascertaining the market value of the property as of the time of the taking.

In determining the landowner's just compensation for what is taken from him, the fact finder is entitled to consider every factor affecting the price which the prudent and willing buyer and seller would exchange for the property. Some realities, however, must be excluded from the computation, which means that the exercise becomes to some extent hypothetical. The willingness and ability of buyer and seller are assumed. The fact of condemnation itself is excluded; fair market value must, by definition, be computed as if there were no proceedings to eliminate that market.

504 S.W.2d at 830. Under this standard, modification of the fair market value "is allowed up to the time that the condemnor manifests a definite purpose to take the particular land," even though this announcement preceeds the filing of a Statement in Condemnation in the County Court at Law. City of Fort Worth v. Corbin, 504 S.W.2d at 831–832. Just as the property owners in *Corbin* could not benefit by the increase in fair market value that developed after the announcement of the public project and before the filing of the Statement in Condemnation, so too property owners cannot be divested of justifiable compensation due to a decrease in market value during the hiatus between the announcement of a public project under the *Corbin* guidelines and the commencement of condemnation proceedings.

These compensation standards are alleged to be constitutionally deficient in two respects: first, in excluding from the computation of market value any consideration of pre-hearing activities that affect the market value at the time of the hearing; and, second, in failing to provide for sufficient compensation to permit property owners to acquire "substantially similar housing in similar neighborhoods." [23]

23. Plaintiffs' standing to assert these arguments is highly questionable. The record is devoid of any evidence that any activities of the condemnor that preceded the hearing before the Special Commissioners in Condemnation affected, directly or indirectly, the market value of the property sought to be condemned as of the date of the hearing.

As a contingent future possibility, conduct of this nature poses an interesting hypothetical constitutional issue. However, we question whether property owners who have not been affected may utilize it to contest these statutes. There was evidence presented before Hon. Sarah T. Hughes on plaintiffs' Motion for Preliminary Injunction to the effect that

As to the first alleged deficiency, plaintiffs do not contest the merit of a market-value compensation standard, but rather assert that the time period at which the market value is fixed results in an artificial valuation due to changes in the market between the date that the condemnation is authorized by the City Council and the date of the hearing of the Special Commissioners in Condemnation. This is not a novel argument. Property owners have repeatedly sought to modify the market value of their property by a consideration of past or future conduct on the part of the condemnor,[24] and such attempts have consistently failed.

In Kerr v. South Park Commissioners, *supra* note 24, the city appropriated land for a public park, and the property owner attempted to introduce evidence of increased property values as a result of the proposed project. The Supreme Court, however, rejected this argument, holding that the compensation to be awarded was the market value of the condemned property situated as it was on the day the condemnor took possession of the property. In Shoemaker v. United States, *supra* note 24, the property owner sought to have the market value of property sought to be condemned reflect changes in the value of other adjacent property by virtue of the proposed project. In rejecting this argument, the Court stated:

> While the board should be allowed a wide field in which to extend their investigation, yet it has never been held that they can go outside of the immediate duty before them, viz., to appraise the tracts of land proposed to

be taken, by receiving evidence of conjectural or speculative values, based upon the anticipated effect of the proceedings under which the condemnation is had.

147 U.S. at 305, 13 S.Ct. at 393.

The compensation standard approved as constitutional in *Kerr* and *Shoemaker* is operative in Texas through City of Fort Worth v. Corbin, *supra*, in which property owners sought to prove increases in market value of property due to the announcement of the proposed construction of a regional airport. In refusing to permit such an adjustment in market value, the Supreme Court of Texas stated:

> When it becomes known to prospective purchasers that the landowner's entire tract will soon lie beneath a highway or airport, the market should thereafter allow no benefit for that land because of that project. (Citation omitted) Suppose that Jones owns ten acres across the street from a great new intercontinental jetport and that Brown owned ten acres which becomes the site for the jetport's entrance; it is good fortune and an incident of ownership at the right place that enrich Jones. The condemning authority is not required to match Jones' good fortune for Brown. The authority needs only to compensate Brown for the market value of his land, and that market at some point ceased to enjoy the same prospects as did Jones' land. This was a known fact among those who buy and sell property from the time the condemning authority announced its intention to include

---

the proposed purchase price offered by the City of Dallas was insufficient to secure substantially similar housing in a similar location. There is no evidence that the Report of the Special Commissioners in Condemnation fixing the amount of damages resulted in an award insufficient to permit the property owner to relocate under the standards desired.

24. See United States v. Chandler-Dunbar Co., 229 U.S. 53, 76, 33 S.Ct. 667, 57 L.Ed.

1063 (1913); Boston Chamber of Commerce v. Boston, 217 U.S. 189, 194–195, 30 S.Ct. 459, 54 L.Ed. 725 (1910); Backus v. Fort Street Union Depot Co., 169 U.S. 557, 18 S. Ct. 445, 42 L.Ed. 853 (1898); Sweet v. Rechel, 159 U.S. 380, 396, 16 S.Ct. 43, 40 L.Ed. 188 (1895); Shoemaker v. United States, 147 U.S. 282, 302–306, 13 S.Ct. 361, 37 L. Ed. 170 (1893), and Kerr v. South Park Commissioners, 117 U.S. 379, 6 S.Ct. 801, 29 L.Ed. 924 (1886).

Brown's land and exclude the land of Jones.

504 S.W.2d at 831. Although the state courts have not yet passed on the converse of *Corbin*, i. e.: when the market value of property decreases due to the proposed project, we are of the opinion that the same principle would apply such that property owners would receive compensation computed without regard to diminution factors arising by virtue of the public project in issue. We believe, therefore, the compensation standards in Texas guarantee to property owners a fair and just compensation free from the evils to which they object.

■ Plaintiffs argue that the market value of property becomes deflated once the condemnor gains the right to possession. As a practical matter they may be correct; however, by establishing the market value in advance of possession, which is the procedure in Texas, there can be no artificial decrease in market value. We note also that, if true, plaintiffs' allegation that these defendants engaged in a pattern of conduct that affected the market value of the property to be condemned before filing the Statements in Condemnation bears on their claims under the Civil Rights Act, not on the basic constitutionality of these compensation standards.

■ Regarding the sufficiency of the compensation, plaintiffs argue that under the Fourteenth Amendment mere payment of the market value of the condemned property is insufficient compensation *unless* the property owner may purchase similar housing in a similar location at that price. We are extremely sympathetic to this argument; however, we can find no constitutional underpinnings for it and must, therefore, reject it. The rule has been firmly fixed that a property owner is entitled to recover only the value of his property as of the time of condemnation. To order payment in excess of the fair market value is to compel the expenditure of public funds under circumstances that might well constitute a breach of fiduciary obligations imposed upon the State and its officials.

Moreover, plaintiffs' argument is virtually identical in substance to that made by the property owners and rejected by the Supreme Court in Boston Chamber of Commerce v. Boston, 217 U.S. 189, 30 S.Ct. 459, 54 L.Ed. 725 (1910). When the City of Boston condemned a building in order to construct a public street, the owner of the fee, the owner of an easement, and the mortgagee requested a lump sum assessment, rather than an assessment of their individual interests. The City, however, asserted that each interest must be valued independently since the condemnation would affect each interest differently. The trial court agreed with the City and ruled the jury could not consider the economic impact of joint transactions by the owners of the fee and the easement. The Supreme Court affirmed the compensation standard stating:

> The only question to be considered is whether when a man's land is taken he is entitled, by the 14th Amendment, to recover more than the value of it as it stood at the time.
>
> \* \* \* \* \* \*
>
> But the Constitution does not require a disregard of the mode of ownership, —of the state of the title. It does not require a parcel of land to be valued as an unencumbered whole when it is not held as an unencumbered whole. It merely requires that an owner of property taken should be paid for what is taken from him. It deals with persons, not with tracts of land. And the question is, What has the owner lost? not, What has the taker gained?

217 U.S. at 194–195, 30 S.Ct. at 460.

■ In Texas property owners are entitled to any increases in market value between the time of their purchase of property sought to be condemned and the date of the hearing before the Special Commissioners in Condemnation, except when such increases are the result

of the proposed project. City of Fort Worth v. Corbin, *supra.* So, too, they must bear the risk of property diminution such that the fair market value when paid has not maintained the pace of inflation; this is the mandate of *Kerr, Boston Chamber of Commerce, Shoemaker* and other related cases that are binding upon us.

■ *4. Protections Against Wrongful Conduct.* Plaintiffs' final objections to the eminent domain statutes relate to the protections granted property owners in the event the condemnor abandons the project, terminates the condemnation proceeding, or has wrongfully seized the property.[25]

We note first that the allegation that title to property sought to be condemned may be transferred pendente lite to the name of the potential condemnor after possession has been surrendered under Article 3268 is not a correct statement of Texas law. When the condemnor acquires possession through Article 3268, it acquires only the right to enter upon and possess the property sought to be condemned. Title is vested by virtue of a final judgment, *see* Article 3271, and no administrative body possesses the authority to divest title prior to that time. Indeed, the retention of title in the landowner until a final judgment can be rendered is an admirable protection for property owners.

■ The last contention that we need discuss is that Article 3268 establishes a ceiling on damages that a property owner may recover in the event the condemnor takes temporary possession and thereafter abandons the condemnation proceeding, which ceiling "may be insufficient to restore the land and residences destroyed by the condemnor." For the reasons stated in note 25, we are obligated to hold that plaintiffs have no standing to raise this issue. Not only is there no threatened destruction of the property of these plaintiffs, but there is no evidence before this court that the reconstruction costs would exceed the award of the Special Commissioners in Condemnation that has been deposited in the registry of the County Court at Law.

## IV.

Plaintiffs have painted a forceful and compelling picture of the unhappy situation in which they find themselves. Eminent domain proceedings of the type being challenged in the case at bar assume massive significance to urban property owners. To displace an entire neighborhood generates social problems that cannot be solved by money alone. There was a time when eviction by condemnation merely resulted in relocation. The property owners had available multiple housing alternatives. No longer is this true. Our urban communities are ringed with expensive surburban developments; within the city habitable residential facilities become "restricted" by economic, social, geographic, and racial predicates.

Plaintiffs' basic complaint is that the Texas eminent domain statutes have not been brought into the Twentieth Century. We are thoroughly sympathetic with this indictment, for surely this case presents a telling example of the basically unsatisfactory consequences of attempting tc fit a statutory scheme designed for a rural, frontier society to the realities of modern, urban civilization. Unfortunately, antiquarianism is

---

25. One of the major attacks made by plaintiffs is against Article 3265(6), which permits the potential condemnor to take a voluntary nonsuit after the jury has returned its verdict but does not grant this same privilege to property owners. While this statute raises interesting equal protection issues, these *Joiner* plaintiffs have no standing to maintain their challenge. The City of Dallas has not taken any action under Article 3265(6), nor is any future action threatened. While it is not always necessary that potential plaintiffs sustain an actual injury before adjudicating the constitutionality of a statute, *see, e. g.,* Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), it is necessary that the litigation involve an "actual controversy" which requires at least the threat of such conduct.

no guarantee of unconstitutionality, and outmoded statutes are not invalid per se. In the absence of some other perceived constitutional defects, it is not for the judiciary to engine old laws into modernity.

Measured against the accumulated wisdom of economists, sociologists, city planners, psychologists, and other persons of both scholarship and practical experience, we have no doubt that the Texas eminent domain statutes fall far short of perfection. It might well be, for example, that given the realities of modern civilization, the condemning authority ought to ask for, listen to, and cautiously weigh the opinions of affected property owners before commencing condemnation proceedings. Moreover, today's property owners as a class are better able to participate intelligently in the decision-making process. Not only do they have access to government assistance programs which will help them to propose and articulate viable alternatives to a suggested project, but they also have the ability to present a new dimension to a discussion that has far too long been dominated by panjandrums representing a select elite. It might also be that in defining "just compensation" the condemnor should consider the economic realities of displacement, the practical limitations of relocation, and the modification of life styles resulting from the creation of a "public project," and voluntarily adjust the compensation standard to recompense property owners more completely.

Even if we had the ability to do so, however, which we do not, we could not accept plaintiffs' invitation to write a model eminent domain code. Our job is adjudicative and judicial, not legislative or programmatic. And in performing this role the standard against which we must measure the Texas statutes here challenged is not that supplied by legislative reformers, but that provided by the United States Constitution.

We recognize, of course, that the constitutional requirements of due process and equal protection are not necessarily static concepts. Neither, on the other hand, are they protean labels capable of encompassing every desirable innovation and improvement. Even viewed through a 1974 prism, the Constitution does not purport to correct every wrong; and though it is the Supreme Law of the Land, the rights it secures to citizens constitute the bedrock of our legal system, not the summit.

We have concluded that the sum of the stigmata detected in the Texas eminent domain statutes does not total constitutional deficiency. This means only that these statutes do insure to property owners their minimum rights under well-established interpretations of the Fourteenth Amendment. We cannot compel more than this, for the Constitution is not a blueprint for the heavenly city.

An appropriate Judgment will be subsequently rendered.